STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARIE
MOORE, DEFENDANT-APPELLANT.

Argued March 1, 1988—Decided October 26, 1988.

240

*Arnold I. Budin* and *Roy B. Greenman,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Gary H. Schlyen,* Acting Senior Assistant Prosecutor, argued the cause for respondent (*John P. Goceljak,* Acting Passaic County Prosecutor, attorney).

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*W. Cary Edwards,* Attorney General, attorney; *Arthur S. Safir,* Deputy Attorney General, of counsel and on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

In November 1984, a Passaic County jury convicted Marie Moore of the capital murder of Theresa Feury and sentenced her to death. She appeals directly to this Court as of right. *See R.* 2:2–1(a)(3). We reverse both defendant's murder conviction and sentence of death. We reverse defendant's capital murder conviction because the trial court failed to charge the jury regarding diminished capacity and the lesser-included offenses of manslaughter and aggravated manslaughter. We reverse the sentence of death because (1) the trial court failed

to instruct the jury properly regarding the weighing of mitigating and aggravating factors in accordance with our decision in *State v. Biegenwald,* 106 *N.J.* 13, 62 (1987); and (2) the evidence does not support the jury's finding that defendant committed the homicidal act "by her own conduct" as required by *N.J.S.A.* 2C:11–3c. We remand the matter to the Law Division for a new trial.

## I.

### Facts

On December 22, 1983, the police searched an apartment that the defendant formerly occupied, and discovered in a crawl space behind the bedroom wall the partially mummified body of Theresa Feury. The investigation into the young girl's death revealed the bizarre pattern of conduct that occurred in defendant's household for a period of time commencing in September 1981 and ending in December 1983. Defendant's conduct during this two-year period formed the basis for the thirty-three count indictment that charged defendant with the murder of Theresa Feury, as well as numerous crimes committed against other victims. To simplify this complex factual scenario, we will subdivide our recitation of the facts into three distinct time periods. Each time period corresponds to the presence in the Moore household of different persons who were victimized at the defendant's direction.

A. *First Time Period: September 1981–November 1981*

In September 1981, the Moore household was located at 1031 Madison Avenue, Paterson, New Jersey. Living in the household at that time were (1) the defendant, Marie Moore (Marie), age thirty-five; (2) Tammy Moore, defendant's daughter, age twelve; (3) Harriet Bayne, a friend's daughter left in defendant's care, age twelve; and (4) Mary Gardullo, defendant's friend of several years, age fifty. Sometime in July or August 1981, three other children began to visit the Moore household

on a regular basis. These other children were Ricky Flores, age fourteen, Theresa Feury, the murder victim, age twelve, and Luis Mantalvo, age thirteen. The summer of 1981 was a funfilled one for the children. Defendant Moore took them to beaches, amusement parks, and bowling alleys. The children enjoyed spending time in the Moore household, and developed great affection for defendant during the course of the summer. Such was their affection for defendant that they began to call her "Ma."

On or about September 13, 1981, changes began to occur in the Moore household. At that time, defendant informed the children that her ex-husband was the famous singer and songwriter, Billy Joel. This, of course, was untrue. Moore in fact never had been married. Nevertheless, Moore told the children that Billy Joel had returned to establish some order in the household and for his daughter Tammy's engagement to Ricky Flores, who had been Tammy's boyfriend throughout the summer. Defendant told the children that things had gotten too wild in the house, and that Billy would see to it that matters were straightened out. Naturally, the children were puzzled by defendant's story. Moments later, defendant answered the phone in the living room, and asked the children to gather there. She then informed Tammy, who was convinced that Billy Joel was her father, and Mary Gardullo that Billy wanted them to stay out of the living room.

Once assembled in the living room, Marie began to relate to the children the instructions that she was allegedly receiving from Billy Joel over the phone. She described to them that Billy Joel was a member of the mafia, that he would be assigning household chores to each child, and that he would have a bomb go off in the house if the children were to disobey his orders or tell anyone outside the household what was going on at 1031 Madison Avenue. Marie also told the children that Billy Joel or other members of the mafia would harm the children's family members if they disobeyed. According to Marie, Billy wanted to put Ricky Flores in charge of the

household in order to see if he could be an effective head of household once he married Tammy. Marie then instructed the children to return to the house on a daily basis.

Throughout this first time period, Marie would give the children a list of rules and chores that she said she received from Billy over the phone. Their chores would change on a weekly basis on orders from Billy. After school, the children arrived at the Moore household as requested. Shortly thereafter, the phone rang. It was Billy. While ostensibly speaking to Billy, Marie instructed the children to recite the list of rules she had given them earlier that morning. If one of the children did not recite the rules correctly, Marie informed Ricky that Billy wanted him to discipline that child so that the child would remember the rules in the future. Thus began the cycle of punishments in the Moore household.

After enduring their punishments, the three children then performed their assigned chores. At a pre-arranged time, Marie made a call to Billy. Marie told Ricky that Billy wanted him to inspect the children's work. Ricky conducted his inspection and reported to Marie that the others had done an adequate job. Marie replied that Billy said that the cleaning was not done properly because he knew that there was dirt under the kitchen table. Ricky then found dirt under the table and told Marie that Billy was right. Marie then related Billy's instruction that the children be beaten with the bat again. Ricky would beat the children for these "failures," and Marie would direct Ricky while talking on the phone with Billy.

All of the children and Mary Gardullo believed that Billy existed and that Marie was speaking with him on the phone. Defendant provided proof of his existence in a number of ways. First, she received phone calls, instead of just making them to Billy, thus showing that he was in touch with her. The children did not know that Moore could make these phone calls herself, using techniques that she learned when working for the phone company as a telephone operator. Second, Mary Gardullo had

been exposed to the Billy character in 1978 when she accompanied Moore to California, and because of the experience she had in California, and because she trusted and liked Moore, she believed in Billy's existence and feared him. When she heard about the first phone call, she became very upset, and her reactions helped to further convince the others that Billy existed. Third, the phone inspections showed that Billy knew what was going on in the household. These instances reinforced the children's belief that Billy existed, and thus their fear that as a member of the mafia he could hurt them and their families if they did not keep coming back to the Moore household.

Harriet, who finally escaped the household in late November, bore the brunt of the "punishments" during the first time period because she lived in Moore's apartment. Luis Montalvo, who left at the end of October, endured physical abuse for less than two months. His punishments, however, took a heavy physical toll on him. Mary Gardullo was not beaten at the start, but punishments did start in October because she was butting in and being "nosey." Theresa, who came to the household every morning and afternoon, was beaten regularly during this first time period.

Luis visited the household only during the first time period. The beatings and torture that he had to endure were lessened somewhat because his family lived close by and he had to meet his parents' curfew. At the end of October, Marie, fearful that Luis' family would intrude, summoned Luis into the living room where she and Ricky were sitting. Moore told Luis that Billy had said that he could go home and would not have to return to the Moore household. Moore then told Luis that Ricky would "give him something to remind him not to say anything." Ricky took Luis to Mary Gardullo's room, where he instructed Luis to raise his hands over his head. Ricky then beat him with his fists, bloodying his nose. After this beating, Luis left the Moore household for good.

Shortly before Luis left the household, on or about October 25, 1981, two important events occurred: Ricky Flores became a permanent resident, and Billy began to speak and issue instructions through the body of Marie Moore. Because defendant now "became" Billy, the phone calls ceased. The first time that Moore "became" Billy occurred soon after Flores moved in as a permanent resident. Moore came back to the apartment and told Mary, Harriet, Theresa, Tammy, Luis, and Flores that Billy's men pulled her over and gave her an injection that would allow Billy to come into her body and speak through her. Moore asked them to keep giving her coffee because of the drug that had been injected. They were sitting in the kitchen drinking coffee and then Marie put her hands over her face, removed them and said, "I'm not Marie, I'm Billy".

The children and Mary Gardullo believed that Billy was in Moore's body because she sounded different. Her voice was "really cold", and she began "talking like a man [and] her voice got deeper." In addition, she sounded more demanding, had a "meaner voice" and "she swore a lot," which was something that Moore had not done before. After this initial occasion, Moore began to change into Billy regularly, and would give Flores orders in the masculine voice.

The week immediately preceding his move to the Moore household, Ricky's parents grounded him after discovering that he had not been attending school. Ricky's mother became suspicious when Moore called her on Friday, October 16th, to tell her falsely that her son was working at the shore for the weekend. Mrs. Flores had explicitly told Ricky to be home that night. Ricky's mother then called the school. She discovered that he had not been going to school, and that a woman posing as Ricky's mother had told the school that her son had injured his back and could not attend school. This woman was Marie Moore.

When Flores returned home on Sunday night, October 18th, his mother told him that he would be grounded and that she or

his father would take him to school and bring him home each afternoon. That Monday morning and the other times that she went to and from school that week with her son, Mrs. Flores noticed Marie Moore following her in the Ford Pinto that Moore drove.

On Saturday morning, Flores left his parent's home for good. On leaving his parent's home, Flores ran to Moore's car, which was waiting on the corner. Moore told him that he would have to stay in the house for four weeks so that he could get her off the drugs that Billy said she was taking. Earlier, Moore had told him that Billy wanted him to help her, and Flores had taken Moore's keys and pills home, supposedly so that she could not go out or take drugs. Thus, Moore's statement that "Billy" wanted him to stay with her for four weeks to get her off drugs seemed reasonable to Flores.

Moore and Flores were not sexually intimate during this first time period. However, during this time period, Flores and Tammy discontinued their relationship. The break-up occurred because Billy told them that they could not see each other anymore. Moore and Flores were physical in other ways. Moore hit Flores for failing to keep the other children in line, or for supposedly lying to Billy on one occasion, and she would tell him that Billy had ordered the punishment. Flores would hit Moore approximately twice a day with either the bat, his hands, or a book. At times, Moore seemed to enjoy the punishment, teasing Flores that he did not hit hard enough.

After Flores moved in permanently, he continued to keep in touch with his mother, phoning her two to three times a day. Flores asked Moore if he could go back home but was told that he had to stay permanently. When Flores called home he would tell his mother that he was happy living away from home and that he did not want to move back. He would tell her this in an angry tone because Moore told him to be distant with his mother and not to tell her that he was at her house. Moore told Flores that his mother had filed a complaint against him at the

end of October and that this showed that she did not care about him.

After Mrs. Flores filed the complaint, in which Mrs. Flores charged her son with being wayward and incorrigible, the police conducted an investigation. Mrs. Flores regularly called Moore to ask her where her son was, and Moore denied knowing where Flores was staying. Moore even told Mrs. Flores that she could search her house and that she would not find her son, an offer that Mrs. Flores declined. The police and DYFS workers came to look for Flores during this one-month period before Harriet escaped, but Moore would hide him in a crawl space in the middle bedroom.

Throughout this period, Ricky continued to administer beatings and other punishments to Harriet and Theresa at Moore's direction. Ricky continued to beat Harriet and Theresa with the whiffle ball bat a number of times each day. Ricky also beat Harriet, Theresa, and Mary with medical books, instead of the bat. Flores began to use the books in early October because Moore said that Billy, who was on the phone, had told her that the bat was not hurting them enough.

Ricky did not beat Mary Gardullo initially, but began to do so during the latter part of this time period when she tried to keep Ricky from beating Harriet. Billy, who was still on the phone at this time, supposedly told Moore that Mary should do chores and be punished because she was too nosey and was butting in. Ricky then began to punish Mary as he did the children.

After two failed attempts, Harriet finally escaped from the Moore household on November 27, 1981, ending the punishments and beatings for her. On the day of her escape, Harriet left the Moore household and ran towards her brother's house in Lodi, but because she was unsure of the exact route, she stopped often to ask directions. One person, noting that she was not wearing shoes or a jacket, called the police. When Harriet saw the police car she ran, but the policemen caught up with her and took her to the station.

At the police station, Harriet gave a long statement in which she told the police what happened. She did not, however, mention Flores or Moore by name nor did she give her address, fearing that she would be sent back to Moore's house. She did tell the police that someone named Sir or Boss was beating her at the direction of someone on the phone. Afterwards, the police took her to a hospital for an examination, which revealed the extensive beatings she had received.

Harriet stayed in the hospital for a week and during that time talked to two DYFS caseworkers and gave them Flores' name and Moore's address. DYFS started an investigation based on Harriet's story and the evidence of physical abuse. The DYFS caseworkers went to talk to Moore, who denied that Flores lived there or that any beatings had taken place, and suggested that Harriet might be fantasizing. Moore said this in a very calm and credible manner, presenting the two caseworkers with a dilemma because Harriet's story was quite incredible, yet she had been beaten, and at the same time Moore's denials seemed believable. The DYFS caseworkers recommended that Harriet not return to Moore's household and they sent Harriet to a ninety-day program at a Diagnostic Center.

B. *Second Time Period: November 27, 1981—May 31, 1982*

Harriet's escape and the subsequent DYFS investigation caused some turmoil in the house at the start of the second time period, which begins with Harriet's escape on November 27, 1981, and ends with Mary Gardullo's escape on Memorial Day, May 31, 1982. During the first few weeks after Harriet's escape, investigators went to the apartment in search of Flores and to question Moore. Moore hid Flores, and continued to hide him during this second period, as well as much of the third time period. About two weeks after Harriet's escape, Moore told Flores that Billy ran Harriet over in his car. Flores believed Moore, and this instance further demonstrated to him

the power that Billy wielded and the consequences of disobeying him.

During this second time period, there were only two victims left in the house, Mary Gardullo and Theresa Feury. The punishments during this six month period became increasingly severe. The household relocated from 1031 Madison to the second floor of 989 Madison, a home owned by Ferdinando Ragusa. Ragusa was close to Moore, and she said that he was Tammy's grandfather.

In January 1982, shortly before moving to 989 Madison Avenue, Ricky and Marie became sexually involved. One morning in January 1982, Moore, as Billy, and Flores were talking in the kitchen. Billy told Flores that Marie loved him and wanted to go to bed with him. Billy then asked Flores whether he wanted to be Marie's boyfriend or her son. Flores responded that he perceived Marie as a mother. Billy told Ricky that he should decide which he wanted to be. Billy added, however, that Ricky should not hurt Marie's feelings, and that he had beaten up other guys who mistreated Marie in the past. Ricky then decided to have sexual relations with Marie. When they moved to 989 Madison, the sexual relationship continued.

Moore continued to encourage and direct Flores to punish Mary and Theresa, setting up punishments for the day and showing him different and more sexually deviant forms of torture. Billy encouraged Flores by telling him that he had to compete against other children who were administering punishments in similar households. Flores and Moore, as Billy, would also talk and set up the punishments for the day before Mary and Theresa returned to the house.

The punishments that Flores inflicted on Mary and Theresa were more severe than those he meted out in the first time period, and they increased in severity over time. During the first two weeks after Harriet's escape, Flores and Moore introduced the use of thumbcuffing, which was a very painful procedure in which one thumb would be cuffed to one big toe

while the victim was lying on her stomach. Flores would thumbcuff Mary and Theresa in the nude and force them to remain in that position for close to an hour at a time. Ricky would supplement the thumbcuffing with variety of other punishments, including kicking, blows with a bat or book, and cigarette burns.

Mary left the home on Memorial Day, May 31, 1982. Mary escaped by telling Moore the night before that she wanted to work on Memorial Day so that she could make extra money (time-and-a-half) for the household, and Moore, who wanted the money, told Flores that he should let her go that next morning. Mary went to work that day, but only used the phone to contact her brothers and sisters who took her to the shore, where her family had her talk with a detective from the Toms River Police Department. The Toms River detective, Tom Kerwin, spoke with her for about three hours and she eventually allowed him to look at her body to see the extent of the beatings. Kerwin said that Mary was, "very distraught and emotionally destroyed" and that she was in, "very, very poor physical condition." Detective Kerwin convinced Mary to go to the hospital for medical attention. She later gave a statement to the police, describing the beatings and tortures she endured at Flores' hand. She did not name Billy, but did name Marie Moore as someone who knew what was being done and gave the address, as well as alerting the authorities to the punishments that Theresa was suffering.

C. *Third Time Period: May 31, 1982—December 28, 1983*

The third time period encompasses the events that occurred after Mary Gardullo's escape, leading up to Moore's arrest in December 1983. The allegations that Mary made against Flores and the fact that these events were said to occur at Moore's home in Paterson against Theresa, a juvenile, led the police to refer the matter to Passaic County DYFS and to the Juvenile Division of the Paterson Police Department. DYFS assigned the matter to one of its social workers, Ms. Cathy

Della Pesca, on June 7th. That same day, Della Pesca spoke to Theresa and Tammy at school about the alleged beatings. Both denied the allegations, but told Della Pesca that they had seen Flores recently at the Moore household. Della Pesca then went to see Marie Moore who denied any knowledge of the beatings, stating that "Theresa Feury was her godchild and that she would not allow harm to come to her." Moore also initially denied having seen Flores after January 1982, but changed her story when confronted with Theresa and Tammy's statements that Flores had recently been in the household, and thus admitted that she had last seen him three weeks earlier when he visited briefly.

On the basis of these conversations, Della Pesca spoke to Grace Opresnick, a fellow DYFS worker who had been assigned to the Harriet Bayne investigation. She then contacted the Paterson Police Department to request an escort to Moore's house. On this same day, June 7, Della Pesca returned to 989 Madison with her supervisor, Detective Dolores Most of the Paterson Police Department's Juvenile Division, and Detectives Stell and Dowling. Detectives Stell and Dowling covered the rear of the building, while Most, Della Pesca, and the DYFS supervisor went to the front door and were admitted by Moore.

Theresa tried to escape by the rear door but was stopped by Stell and Dowling who sent her back in. Inside the home, Della Pesca and Most questioned Moore about the alleged beatings and sexual abuse, which she continued to deny. Della Pesca then asked Theresa to undress. When Theresa undressed, Della Pesca saw numerous bruises on her body. Theresa and Moore said they were surprised and that she must have fallen at school.

Della Pesca then made an appointment with a doctor, Mercedes Lecesne, who then examined Theresa two days later, on June 9th. Della Pesca also took photographs of Theresa's body in order to document her injuries. Dr. Lecesne found that the bruising was not consistent with a fall and that it was consist-

ent with beatings, cigarette burns, and other repeated serious physical abuses.

The day after this examination Della Pesca took Harriet and Theresa to the police to solicit statements from them. Harriet told Detective Most that Flores and Billy, who came through Marie Moore, were responsible for the beatings and abuse that she had suffered. Theresa gave a statement after Harriet, but only after Most assured her that the police were interested in apprehending only Flores, not Moore. Prior to this date, Mary Gardullo visited the station and gave a statement concerning the beatings and abuse to Detectives Stell and Dowling, which Most reviewed prior to calling Moore in for questioning on June 10th.

During her June 10th interview with Detective Most, Moore started to deny the allegations of beatings and abuse. However, when confronted with Mary Gardullo's prior statement to police, Moore admitted that the beatings and abuse had occurred, but claimed that she was also a victim. In the formal statement that followed, Moore claimed that Flores would come to the house on the weekend, that she rejected his sexual advances, and that he would abuse her and Mary Gardullo, who tried to stop Flores from hurting Moore. She claimed that she never saw Flores abuse Theresa and that he never hurt Tammy, but that he did threaten to do so if Moore told on him, which was the reason for her earlier denials.

On June 11, 1982, Della Pesca contacted Moore, who continued to deny that she knew where Flores was at the time. On this same day, Detective Most talked to Luis Montalvo who denied any allegations of abuse. Unknown to Most, Moore had found Luis that morning and had warned him that Billy would get him and his family if he said anything to the police about Flores. Detective Most then contacted Moore and told her that she should call the police if she saw Flores. Moore agreed.

During this third time period, Theresa was the only victim left in the house. The punishments she suffered increased in

severity. During the time between May 31 and September 1, 1982, Theresa visited the house and was abused on a daily basis. Her physical condition on June 9, 1982, when Dr. Lecesne examined her at Della Pesca's request, showed evidence of the severe abuse she was suffering.

Theresa finally became a permanent resident of the household on September 22, 1982. Theresa came to stay permanently because of a phone conversation that same day between her grandmother and Moore. Theresa's grandmother told Moore that DYFS workers and detectives were interested in speaking to Theresa. Marie became fearful that Theresa would disclose what was going on in the household. One week later, Billy told Theresa that she was a permanent resident of the Moore household.

Theresa, Moore, Tammy, and Flores continued to live on the second floor of 989 Madison Avenue until late October. At that time, the four moved to the *third* floor of 989 Madison Avenue. Although Theresa stopped doing chores once they moved to the third floor, she continued to suffer terrible abuses. During the day, Flores kept Theresa cuffed to a hook on the kitchen wall. At night, Flores would transfer her to the bathroom, where he would cuff her to the bathtub. Flores also sexually abused her, and for some period of time Moore would take Theresa down to the elderly Ragusa, who would pay Moore to have Theresa perform oral sex. Moore and Flores also stopped feeding Theresa once they moved to the third floor and no longer allowed Theresa to use the bathroom. At first, they gave her a pot, and Moore later purchased disposable diapers. The Pampers were the only things that they permitted Theresa to wear.

One morning before her death, this continued treatment caused Theresa to lose consciousness. Moore helped Theresa to come out of this condition, and for this short time Moore released her from the cuffs, even though Flores insisted Theresa was faking. However, after bringing Theresa out of this "seizure," Moore put Theresa back into the thumb cuffs.

On the eve of her death, Theresa slept cuffed to the bathtub, as usual. On the morning of her death, Moore told Flores to get Theresa out of the bathroom so that Tammy could wash up for school. Flores would do this every morning by releasing Theresa from her cuffs, permitting Theresa to walk on her own to the kitchen, where he would then recuff her. Following his customary procedure, Flores uncuffed Theresa, who had been lying facedown. Noting that she was not getting up on her own, Flores lifted her up by her shoulders, bringing Theresa to her knees. He let go of her and instead of getting up, Theresa fell, striking her head on the bathtub and then the floor. Flores then picked Theresa up and took her into the hallway, where he checked Theresa's breathing and noted that she was moaning. When she ceased moaning, he pushed down on her stomach, producing a sound "like the sound of someone going to the bathroom." Marie interpreted that to mean that Theresa was dead.

When Tammy left for school, Moore instructed Ricky to place the body in a bathroom crawl space while she went to the store to purchase some items. Flores put the body in the crawl space at Moore's direction, and Moore went out. Moore returned with a yellow garment bag, helped Flores put Theresa's body into the garment bag, and then told Flores to bring the body out from the crawl space. After Flores brought Theresa's body out of the crawl space, Moore and Flores hid the body in the attic. After leaving the body in the attic on a beam, Flores came down into the hallway again, and Moore told him she had to go out again. Moore returned with eight rolls of duct tape. Moore gave Flores the duct tape and two plastic garbage bags. She told him to put one bag over the head, one over the legs, and then to wrap Theresa's body with the eight rolls of duct tape. Flores went up into the attic and wrapped the body, which was in the garment bag, while Moore stood on the cabinet in the hallway looking into the attic to see how he was doing. While Flores was taping Theresa's body, the bulb in the lamp that had been taken to the attic blew out and Flores put

the blown bulb down on the body, where the medical examiner would find it almost one year later. Flores then placed Theresa's bagged and taped body in the part of the attic where the slanted roof met the third floor ceiling, and covered it with insulation. When Tammy came home later in the day, Moore told her that they sent the body to her father, Billy Joel, in New York City.

In May or June 1983, Moore and Flores moved the body from the attic to the wall space in the bedroom because they were moving from 989 Madison, and Billy said that if they had electrical problems, the "electrical man would go up there and see the body up there." Moore opened the hole in the ceiling to get to the attic, went up to the attic, wrapped the body in a quilt and tied it, and then lowered the body down to Flores in the third floor hallway. Moore then came down to the third floor, put the body through a hole in the bedroom wall and into a crawl space behind the wall. Moore and Flores covered the hole leading to the crawl space with wood, which they nailed into the wall before concealing the hole with wallpaper. The body remained in this location until the police discovered it in December 1983.

During the time period between Theresa's death and the discovery of her body, Moore spoke with Theresa's grandmother on numerous occasions. The last time was in September 1983 when Moore asked Mrs. Gioia if she had heard from Theresa. These efforts to conceal her own involvement in Theresa's kidnapping and subsequent death were complemented by Moore's efforts to hide Flores from the authorities.

Prior to moving from 989 Madison Avenue, Moore told Flores that he had to get a job, and she helped him get one as a maintenance helper at Haband. Moore went into Haband with Flores, told them that she was his mother, a widow, and that she needed him to get a job. Moore also told the personnel manager that she would pick up Flores at lunch and after work,

and asked her to "make sure no one else but her picked him up."

Flores worked at Haband for about six weeks, until the first week of July when he left permanently. During this time, Flores, Moore, and Tammy moved within Paterson, from 989 Madison to 101 Martin Street. Flores left Haband permanently because he was spotted at the factory by his brother Philip, who was there on a service call, repairing typewriters. Philip, who was not quite sure if it was his brother, asked a supervisor, who confirmed that it was Richard Flores. Philip then picked up his mother and returned to the factory.

When the two returned, they had Flores paged to the front office. Flores came out from behind a counter, saw his mother and brother standing there and said, "Oh my God, mom," and then ran away. Philip ran after him, but could not catch his brother. Mrs. Flores and he then went back to the house because she knew Flores would call her, which he did. Flores and his mother spoke on the phone. She then asked Philip to deliver certain items to the mailbox at 989 Madison, including a copy of the charges she had filed against Ricky.

The next time that Mrs. Flores saw her son in person was at the police station on July 12, 1983, following his arrest on that same day at Moore's apartment on 101 Martin Street. This arrest came about because Mrs. Flores had contacted the police after she saw Flores at Haband. Detective Most, who handled this part of the investigation, contacted Haband and reviewed their records concerning Flores. On the morning of July 12, Most obtained a juvenile warrant for Flores at the 101 Martin Street address, and gave a copy of that warrant to Officers Washington and DeOld. The two officers entered the premises and found Flores under the sink, whereupon they arrested him and took Flores and Moore to the station for questioning.

Detective Most questioned Flores, who denied everything. He was then placed in a holding room. Mrs. Flores then came to the police station, and asked the court to release her son and

place him in her custody pending his appearance the following day for further investigation. The court agreed and released Flores, whereupon Detectives Most and Stell began to talk to Marie Moore. Moore agreed to talk to them after being advised of her rights. Moore explained to them that she kept Flores in her apartment only because Flores and his mafia boss, Don DeMarco, threatened Moore and her daughter. Detective Most challenged this story, telling Moore she did not believe it. Most also told Moore that she believed Moore and Flores were sexually intimate, contrary to defendant's contention that they had a mother-son relationship.

At 4:30 p.m., after Flores' release, Detectives Stell and Dowling told Moore that she could go, but asked her to return in the morning to take a polygraph exam. Moore agreed and left with Detective Stell. She returned within minutes, however, stating that she wanted to tell them the whole truth. Moore then gave the detectives a formal statement.

Moore repudiated her earlier statements made in June 1982, after Mary's escape, in which she claimed Flores had beaten and assaulted her. She admitted that the DeMarco statements were lies, that she had a sexual relationship with Flores, and that Flores had beaten Mary because she would not "stop interfering in our lives." Moore insisted that Flores had changed since Mary's departure, that he was now a "sweet loving boy," and that he had never hit Theresa or Harriet. Moore also insisted that she did not know where Theresa was, and that she had not seen her since September 1982.

Theresa was still only a missing person at this time, and Flores denied any contact with her. Moore's story again succeeded in deflecting the investigation against her. Charges were filed against Moore in July 1983 for having sex with a minor (Flores), endangering child welfare (Flores), giving a false statement in June 1982, and interfering with Flores' custody. A grand jury returned an indictment in December

1983, but Moore remained free until her arrest on December 28, 1983, six days after she led police to Theresa's body.

Moore made constant efforts to contact Flores after he was arrested, and later to do him in because she was afraid that Flores would talk to the police. In the months following September 1983, Moore tried unsuccessfully to speak with Flores in order to intimidate him so that he would not go to the police. Flores was free at the time, and was living at home. Moore enlisted new people in these efforts, people who moved in with her in September 1983.

Some time after the July 12th statement, Moore and Tammy moved from 101 Martin Street to 356 Park Avenue. In September 1983, a new group came to live with them at the new address. This new group consisted of Jorge Oyola, age twenty, Lydia Santiago, age seventeen, and their two children Jessica, age two, and Jennifer, age one.

Oyola, Santiago, and their two children met Moore through Lydia Santiago's fifteen-year-old sister, Elizabeth, who was a friend of Tammy Moore. They moved into 356 Park Avenue on September 17, 1983, at Moore's suggestion, after a party that Moore hosted for Tammy and Elizabeth. Jorge worked every day, while Lydia and her sister Elizabeth, who visited daily, would stay at the house with Moore. They went out shopping, to movies, got high at the apartment, had men over and "fooled around" with them, having what they considered to be a very good time with Moore. Moore was kind to them and the two children, and in return both Santiagos felt close to her and called her Ma.

This pattern resembles that of the summer of 1981, but none of the abuses that occurred following that summer were to be repeated. Moore told Oyola and the two Santiagos about her relationship with Flores. She would follow him in her car with one or more of them. Moore also introduced Billy Joel to them, telling them how the famous rock star had fathered Tam-

my. She also told them that he was in the mafia, and that Billy and Flores had worked together.

Moore then, as she had in September of 1981, began to receive phone calls that she said were from Billy Joel. Although they never talked to this Billy, Lydia and Elizabeth believed he existed as a result of these phone calls, in which Moore would supposedly talk to Billy about Tammy or ask him for money. Also, just as Moore had done in September 1981, she told Lydia that Billy might have microphones or cameras in the apartment. When Lydia started searching for these items, Marie got a phone call. She said Billy wanted Lydia to stop looking for his microphones and cameras. On another occasion, Moore returned to the house and told them that Billy's Mafia boys injected her with a drug that would permit Billy to enter her. Moore then turned into Billy for the first time. Elizabeth and Lydia believed this transformation, while Jorge did not.

Moore was very concerned with Flores, and in addition to looking for Flores and following him, Moore had the Santiagos deliver messages to him personally. These messages varied from Moore's expressions of love for Flores to threats to report him to the police.

Moore tried to establish that Flores had committed the crimes by instructing Lydia to tell the police, if questioned, that Flores had threatened Moore and Tammy by phone. Moore told Lydia that Billy "was going to get" anyone who testified against Moore. Moore prepared Tammy to tell the police that Flores raped her. She also instructed Tammy to tell the police that Flores had beaten Theresa to death. Moore wrote this story down, and had Tammy rehearse it numbers of times. Lydia and Jorge heard Moore preparing Tammy. Moore told Tammy to be "calm" and "cool" when she spoke with the police.

On December 17, Moore began her plan to prove that Flores committed the murder. She contacted the police to tell them that her daughter Tammy had just told her that Flores had sexually abused her. Moore also told the police that based on

what Tammy told her, she believed that Flores had murdered Theresa Feury, whose body might be hidden at 989 Madison. The police spoke with Tammy who gave them a statement concerning Flores. On that same day, Moore accompanied the police to 989 Madison, where they searched for potential burial sites. None was found.

On December 20, Tammy gave Detective Stell two formal statements, in which she alleged that Flores raped her and that she witnessed Flores killing Theresa Feury. After speaking with Tammy, Detectives Stell and Greenwood went to 989 Madison, met Moore and Ragusa, the owner of the property, and looked at a depression in the ground that Moore claimed was a possible burial site. Moore and Ragusa took Detectives Stell and Greenwood to the third floor apartment, where Moore pointed to a spot in the ceiling and to a paneled area in the bedroom as possible burial sites.

Detectives Stell and Greenwood removed a piece of wood that covered a hole in the ceiling. Greenwood went into the attic crawlspace, found a roll of duct tape, white powder that he recognized as lime, and a tray with candle wax on it, but no body. When Detective Greenwood came out of the crawlspace, Stell noted a "strong foul smell." The detectives left after this, and returned on December 21st with a Public Works crew, which dug up the patch of ground in the back but found nothing.

On the following day, December 22, Ragusa called Stell at 9:00 a.m. to ask him if he was coming with a crew to search the attic. Stell told him that he did not think he would, and stated that he might close the investigation. In fifteen minutes, Moore called to ask Stell if he was really going to close the investigation, and Stell, who had no such intention, answered affirmatively just to see what would happen next. Moore responded within an hour by taking a piece of blood-stained insulation to the police station, which the police then took to a lab for examination.

The detectives told Moore they would come to 989 in the early afternoon with a Public Works crew. It was during this search of the apartment that Ragusa and Moore finally uncovered an opening in the wall that led to the crawl space, where the police discovered Theresa's body. After photographing the scene and the wrapped body, the police sent the body to the medical examiner, thus commencing the investigation that would lead to Moore's arrest and indictment.

On December 22, 1983, the medical examiner, Gertha Natarajun, performed an autopsy on Theresa Feury. Her autopsy revealed that the blow to her head and face had killed her, but that she had been alive for a number of hours after it, albeit in a coma. The blow to the head was consistent with falling on a bathtub or hard floor, while the injury to the face could have been caused by falling against a bathtub or by a direct blow, such as a hard kick. The blood that had gathered around the blow to the face and head indicated that Theresa had been alive when wrapped and taped. The extent of the hemorrhaging suggested that she lived as long as four to eight hours after the injuries. There was not enough soft tissue remaining to determine whether Theresa had suffocated as a result of the taping and wrapping. The examiner did testify, however, that this kind of wrapping could suffocate a living person.

On December 23rd, Moore returned to the police station with Detective Stell. After being advised of her rights, Moore agreed to waive them, and expressed her desire to cooperate in the investigation. Moore initially denied having witnessed the homicide, but after Stell confronted her, she admitted to witnessing it. In this statement, Moore claimed that Flores killed Theresa by slamming her head against the bathtub, that he alone disposed of the body, and that she tried to help Theresa.

Moore next spoke to the police on December 28th. Detective Stell and John Laky of the Prosecutor's Office, which had become involved in the case on December 22, spoke with Moore at the Prosecutor's Office on December 28th. They read Moore

her rights and advised her that she was a suspect in the kidnapping and death of Theresa Feury. She agreed to speak with Laky and Detective Stell.

In this interview, Moore admitted that Billy was not a real person, that he was in her head, and that Flores would bring him out. Detective Stell tried unsuccessfully to bring Billy out. Moore then told them that she would not remember what happened when she was Billy and that she wanted to rid herself of that personality. She mentioned, however, that she did not want to go to the crazy house. Moore stated that Billy played no part in Theresa's death. Moore also claimed that she had not become Billy since Flores left. Moore also repeated her December 23rd claim that Flores had killed Theresa, and maintained that Billy had not been present.

After giving this statement, Moore was arrested on the same day, December 28, and charged with Theresa Feury's death. After reviewing statements from the victims and other witnesses, the prosecutor decided not to charge Flores as an adult, and entered a plea agreement instead, whereby he would charge Flores as a juvenile with a maximum custodial term of three years. In return, Flores agreed to testify against Moore, which he did, and his testimony, along with that of the other victims and witnesses, led to Moore's conviction.

### D. *Indictment & Pretrial Motions*

On April 16, 1984, the Passaic County Grand Jury returned a thirty-three count indictment against Marie Moore. The indictment charged Moore with the following crimes committed against various victims between September 1981 and December 1983: purposeful and knowing murder by her own conduct, contrary to *N.J.S.A.* 2C:11–3a(1)–(2); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3); attempted murder, contrary to *N.J.S.A.* 2C:5–1c and 2C:11–3; two counts of aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a(3)–(4)–(5)(a)–(6); two counts of aggravated criminal sexual contact, contrary to *N.J.S.A.* 2C:14–

3a; one count of sexual assault, contrary to *N.J.S.A.* 2C:14–
2c(5); four counts of aggravated assault, contrary to *N.J.S.A.*
2C:12–1b(1); five counts of kidnapping, contrary to *N.J.S.A.*
2C:13–1b(2); four counts of terroristic threats, contrary to
*N.J.S.A.* 2C:12–3a; one count of burglary, contrary to *N.J.S.A.*
2C:18–2; one count of theft by unlawful taking or disposition,
contrary to *N.J.S.A.* 2C:20–3; one count of theft by deception,
contrary to *N.J.S.A.* 2C:20–4; one count of theft by extortion,
contrary to *N.J.S.A.* 2C:20–5a; two counts of endangering the
welfare of a child, contrary to *N.J.S.A.* 2C:24–4a; one count of
interference with custody, contrary to *N.J.S.A.* 2C:13–4a; three
counts of tampering with a witness, contrary to *N.J.S.A.* 2C:28–
5a(1)–(2); one count of hindering apprehension or prosecution,
contrary to *N.J.S.A.* 2C:29–3a(1); and one count of false swear-
ing, contrary to *N.J.S.A.* 2C:28–2. In nineteen of the thirty-
three counts, defendant's liability was based on a complicity
theory pursuant to *N.J.S.A.* 2C:2–6. The counts in which the
State charged accomplice liability included felony murder, at-
tempted murder, the various kidnapping and assault charges,
as well as those counts involving terroristic threats and theft
by extortion.

On June 23, 1984, the trial court entertained several pretrial
motions: (1) a motion to preclude the State from seeking the
death penalty; (2) a motion for change of venue; and (3) a
motion to sever the indictment. The court denied each of
defendant's motions. On appeal, defendant challenges only the
trial court's denial of the severance motion. *Infra* at 272–76.

Defendant also claimed that the various statements she gave
to police were obtained in violation of the rights granted to her
under *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16
*L.Ed.*2d 694 (1966). The trial court conducted a *Miranda*
hearing and concluded that the statements were admissible.
On appeal, defendant challenges only the trial court's decision
to admit portions of her statement of December 28, 1983.
*Infra* at 277–81.

### E. *The State's Case*

The prosecution's case against Marie Moore was based principally on the testimony of Ricky Flores, as well as that of the surviving victims, namely, Luis Montalvo, Harriet Bayne, and Mary Gardullo. The prosecution used the testimony of the victims to bolster Flores' credibility because their versions of the events in the first two time periods were consistent, for the most part, with Flores' testimony. This bolstering was necessary because Flores was the only witness to the killing of Theresa Feury other than Marie Moore, and it was his testimony that provided the basis for the murder charge. The testimony from Flores and the victims was supported by Moore's four contradictory statements in which she substantially altered her story in an attempt to mislead the authorities. In addition, the testimony of Mrs. Gioia, Theresa's grandmother, as well as that of the DYFS investigators, served to show that Moore deceived these people in an effort to conceal the criminal acts in the household.

The State attempted to show that Moore was the principal who directed Flores and controlled events in the household. In this connection, the State presented a great deal of testimony showing that Billy was a guise that Moore used in order to control her victims and to exercise power over them. The testimony of Flores, Luis Montalvo, Harriet Bayne, and Mary Gardullo was consistent with respect to the phone calls that brought Billy into the house and the first appearance of Billy through Moore. The testimony showed that Moore would separate herself from Billy so that the victims would continue to care for her, while at the same time remain fearful of Billy. The State therefore argued in its case-in-chief that Moore enjoyed controlling her victims, obtained gratification from her power over them, and used them for monetary gain.

### F. *Defense's Case*

The defense presented expert testimony and attempted to elicit testimony from the State's witnesses to support defend-

ant's contention that she was legally insane. Alternatively, defendant sought to establish on cross-examination of the surviving victims and Flores that it was Flores, not Moore, who controlled and directed the household.

In cross-examining Flores, defense counsel sought to establish that Flores controlled the events in the household. Defense counsel tried to elicit an admission from Flores that *he* designed the punishments, and that he enjoyed abusing his victims. In addition, defense counsel focused on Flores' beatings and abuse of Marie Moore to substantiate the claim that Moore was in fact a victim. Defense counsel also vigorously cross-examined Flores concerning Theresa's final days, particularly the day of her death, in an effort to demonstrate that he, not Moore, murdered the victim.

In support of her insanity defense, defendant called three expert witnesses whose testimony the State countered in rebuttal. The defense experts testified that defendant suffered from a multiple personality disorder that rendered her legally insane. One of the experts testified that the multiple personality disorder was the result of defendant's history of sexual abuse. The experts also concurred in their observation that defendant suffered from brain damage, namely, frontal lobe atrophy. The defense supplemented the experts' testimony with evidence of a history of seizures, as well as evidence of defendant's general psychological history. A more detailed account of the insanity defense testimony will accompany our disposition of the diminished capacity issue. *Infra* at 281–88.

In addition to rigorously cross-examining defendant's expert witnesses, the State called three expert rebuttal witnesses. These witnesses concluded that defendant did not suffer from a multiple personality disorder, that she was in fact malingering, and that she was therefore not legally insane. They did, however, conclude that defendant suffered from a personality

disorder of some type, one of the witnesses characterizing it as an antisocial personality disorder. The State also called defendant's parents to counter the defense's claim that defendant's father had sexually abused her, resulting in the supposed multiple personality disorder. Mr. Moore denied the allegations of abuse. The summations that followed have not given rise to any issues on appeal.

### G. *Jury Charges & Deliberations*

The trial court granted defendant's motion for a lesser-included-offense instruction of criminal restraint for the kidnapping charge, but refused the defense's motion for a lesser-included-offense charge of manslaughter for the capital murder charge. *Infra* at 288–93. In addition to the challenges concerning the lesser-included offense charge for capital murder, defendant argues that the charge on "by your own conduct" constitutes reversible error, and for the first time on appeal argues that the charge should have included a diminished capacity instruction. *Infra* at 296–303.

After charging the jury on each of the thirty-three counts, the court charged the jury on the insanity defense, stating first that it could be offered for each of the offenses. The court then stated that if the jury found the defendant not guilty of an offense, it was not to consider the insanity defense with respect to that count. The court further instructed that if the jury found her guilty of an offense, it must then consider whether she was legally insane at the time. The trial court gave the model charge on insanity. On November 15, the jury returned its verdict, rejecting the insanity defense for all counts. The jury found defendant Moore guilty on all counts, except aggravated assault of Luis Montalvo, burglary, and attempted murder. The jury was deadlocked with regard to the aggravated assault and burglary charges, and unanimously acquitted defendant of attempted murder. The jury found the defendant

guilty on all other charges, including murder by her own conduct, and the penalty phase followed.

## H. *Penalty Phase and Sentencing*

Prior to the start of the penalty phase proceeding, one of the jurors, Mr. Sessler, gave the trial court a doctor's note that indicated that his blood pressure was out of control, that he might be having angina attacks, and that he was very nervous and upset. The court conferred with counsel, who expressed no opposition to the trial court's decision to remove Mr. Sessler and draw the name of an alternate to serve as a juror for the penalty phase. The defendant now challenges that ruling on appeal, claiming that the trial court committed reversible error by failing to instruct the jury that it had to deliberate anew on the guilt phase charges with the alternate juror. *Infra* at 304–07.

After choosing and seating the alternate juror, the trial court instructed the jury concerning the aggravating and mitigating factors, as well as other law affecting the penalty determination. The prosecutor relied on the evidence and testimony produced during the guilt phase. The defense also relied on guilt phase evidence and testimony, but in addition introduced the testimony of Tammy Moore, Betty Borressen (Tammy Moore's social worker), Maggie Cooper of the Hawthorne Bible House, and Gladys Mirabal of the Passaic County Jail. Their testimony was intended to show that Moore was involved in helping her daughter Tammy adjust, and that she cared for her fellow inmates.

Based on the guilt-phase evidence, the prosecution presented the following aggravating factors:

(1) the murder of Theresa Feury was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to Theresa Feury, 2C:11–3c(4)(c);

(2) the murder of Theresa Feury was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense or offenses committed by the defendant or another, 2C:11–3c(4)(f); and

(3) the murder of Theresa Feury was committed while the defendant was engaged in the commission of aggravated sexual assault, or kidnapping, or both, on Theresa Feury, 2C:11–3c(4)(g).

Defense counsel, who conceded in his opening that the evidence supported the foregoing aggravating factors, presented five mitigating factors to the jury:

(1) the defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, 2C:11–3c(5)(a);

(2) the age of the defendant at the time of the murder, 2C:11–3c(5)(c);

(3) the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired as the result of mental disease or defect, but not to a degree sufficient to constitute a defense to prosecution, 2C:11–3c(5)(d);

(4) the defendant has no significant history of prior criminal activity, 2C:11–3c(5)(f); and

(5) any other factor which is relevant to the defendant's character or record or to the circumstances of the offense, 2C:11–3c(5)(h).

Defense counsel argued that the mitigating factors outweighed the aggravating factors. In a brief summation, the prosecutor confined his argument to the law and did not seek to inflame the jury. Defendant does not challenge the State's summation on appeal.

The trial court's penalty phase instructions were defective in several important respects, warranting reversal of the death penalty. These defects and the relevant portions of the charge will be discussed in more detail below. *Infra* at 303–04.

The jury deliberated for seven hours on November 19, 1984, before returning a sentence of death. The jury unanimously found beyond a reasonable doubt that each of the three aggravating factors existed. At least one member of the jury found that four of the five mitigating factors existed, rejecting only (5)(f), "no significant history of prior criminal activity." In accord with the verdict sheet and instructions, the jury then weighed each of the three aggravating factors separately against "the mitigating factor or factors." The jury found that the "mitigating factor or factors" did not outweigh any of the three aggravating factors, thus resulting in a death verdict.

On January 3, 1985, the trial court denied defendant's motions for acquittal and a new trial. The trial court then vacated the conviction for felony murder, count twenty-one, "because it merges with the conviction under Count 20 for murder for which the defendant has already been sentenced to death." The court thus dismissed count twenty-one. The court then imposed lengthy sentences for the remaining counts, most to run consecutively, so that the aggregate is a term of 224½ years, with an 87½ year parole ineligibility.

## II.

### Constitutionality of Death Penalty Statute

■ Defendant challenges the constitutionality of our State's death penalty statute [1] on two grounds, both of which we have rejected in an earlier case. The defendant attacks this State's capital punishment statute, *N.J.S.A.* 2C:11-3, on both federal and state grounds claiming it to be violative of the prohibition against cruel and unusual punishment. *U.S. Const.* amends. VIII, XIV; *N.J. Const. of 1947* art. I, para. 12. We addressed this issue in *State v. Ramseur*, 106 *N.J.* 123, 166–82 (1987), and now reaffirm our holding in *Ramseur* that our State's capital punishment statute is not violative of either the federal or the state constitution's ban on cruel and unusual punishment. Next, defendant contends that aggravating factor c(4)(c) is so inherently vague as to violate the due process requirements of the United States and New Jersey constitutions. For the reasons expressed in *State v. Ramseur, id.* at 197–211, we reject that contention again today.

---

[1] *N.J.S.A.* 2C:11-3, the State's capital punishment act (*L.*1982, *c.* 111), consisted of five subsections, (a) to (e), at the time of these crimes and their trials. The death penalty provisions are found in subsections (c) to (e). For convenience, in referring to these provisions we shall, for instance, use Sec. c(4)(a) to designate *N.J.S.A.* 2C:11-3c(4)(a). When cited in its totality, *N.J.S.A.* 2C:11-3 will hereinafter be referred to as "the Act."

## III.

### Pretrial Issues

A. *Death Qualification of Jurors*

■ Defendant relies on the defendant's brief in *State v. Ramseur* to support her claim that New Jersey's process of death qualification of jurors deprives capital defendants of the right to an impartial jury under the federal and state constitutions. In *State v. Ramseur, supra,* 106 *N.J.* at 248–54, we held that the death qualification of jurors prior to the guilt phase of a capital trial was constitutional under both the federal and state constitutions and did not offend notions of fundamental fairness. We find no reason to depart from that holding.

B. *Severance of Indictment*

■ Defendant claims that it was reversible error for the trial court to deny her pretrial motion for severance of the indictment. Defendant contends that the court should have severed the pre-murder (including the murder) counts of the indictment, counts one through twenty-one, from the post-murder counts, counts twenty-two through thirty-three. As the State correctly points out, the distinction between counts one through twenty-one and twenty-two through thirty-three is artificial, because three of the twelve so-called post-murder counts occurred before the murder, and six of these counts alleged conduct that occurred both before and after the murder. Counts twenty-seven, false swearing by Moore to police in June 1982, and counts thirty-one and thirty-two, the burglary and theft of Mrs. Gioia, Theresa's grandmother, were committed prior to the murder. Counts twenty-two through twenty-five, charging Moore with sexual assault on, debauching the morals of, interfering with the custody of, and hindering apprehension of Richard Flores, as well as count thirty, endangering the welfare of Tammy Moore, and count thirty-three, theft by deception from Mrs. Gioia, were committed *both* before and after the murder. Only three of these twelve so-called post-

murder counts, attempted murder of Flores (count twenty-six) and tampering with witnesses Tammy Moore and Lydia Santiago (counts twenty-eight and twenty-nine), were committed exclusively *after* the murder.

In determining whether separate crimes should be joined and charged in one indictment, *Rule* 3:7–6 states:

Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by R.3:15–2.

Defendant argues that the "post-murder" counts are "too separate and too distinct from one another in their elements" and so should not have been joined. Moore argues that the instant case is similar to *Drew v. United States*, 331 *F.*2d 85 (D.C.Cir. 1964), in which the court held that separate and distinct criminal acts " 'not arising out of the same transaction or dependent upon the same proof,' " should not be joined. *Id.* at 89 (quoting *Kidwell v. United States*, 38 *App.D.C.* 566, 570 (1912)). The State counters by arguing that severance was not required in this case where the various counts formed part of a common scheme or plan.[2]

New Jersey courts have consistently held that where the evidence establishes that multiple offenses are linked as part of the same transaction or series of transactions, a court should grant a motion for severance only when defendant has satisfied the court that prejudice would result. *State v. Briley*, 53 *N.J.* 498, 503 (1969); *State v. Begyn*, 34 *N.J.* 35, 56–57 (1961); *State v. Manney*, 26 *N.J.* 362, 368 (1958); *State v. Kent*, 173 *N.J.Super.* 215, 220 (App.Div.1980); *State v. Whipple*, 156 *N.J.Super.* 46, 51 (App.Div.1978); *State v. Cole*, 154 *N.J.Super.* 138, 142–43 (App.Div.1977), *certif. den.*, 78 *N.J.* 415 (1978). The appellate courts have also consistently held that the trial court's

---

[2]The Attorney General of the State of New Jersey participated as *amicus curiae.*

decision on whether prejudice exists is entitled to "a wide range of discretion." *State v. Manney, supra,* 26 *N.J.* at 368. Moreover, courts have held that "the mere claim that prejudice will attach" is not sufficient to support a motion for severance, and require some showing that the joinder of offenses would prejudice the defendant. *State v. Kent, supra,* 173 *N.J.Super.* at 220; *see also State v. Manney, supra,* 26 *N.J.* at 368 ("mere possibility of such harm is not enough to bar joinder or consolidation; if it were, nothing would remain of the rule").

In the instant case, the thirty-three counts of the indictment are related parts of the same common scheme or plan. Defendant must therefore show that even though the acts can be joined in one indictment, the joinder is nonetheless prejudicial under *Rule* 3:15–2(b), which states:

> (b) Motion by Defendant and State. If for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trial of counts, grant a severance of defendants, or direct other appropriate relief.

The trial court denied Moore's pretrial motion for severance. In denying the motion, the trial court stated:

> I have reviewed the Indictment itself and its allegations. I have reviewed the position of the State as set forth in its brief as to its contentions as to what would be established at trial and I find that there—other than the murder counts which are covered by counts twenty and twenty-one, all of the other counts in the Indictment would be admissible under Rule 55, and I find that under these circumstances the motion to sever should and will be denied at this particular point in time. But I want it noted that my decision on severance is restricted at this point in time solely as to the guilt or non guilt at trial.

The trial court properly noted that a key factor in determining whether prejudice exists from joinder of multiple offenses is whether the evidence of these other acts would be admissible in separate trials under *Evid.R.* 55. *See State v. Kent, supra,* 173 *N.J.Super.* at 220; *State v. Maddox,* 153 *N.J.Super.* 201, 207 (App.Div.1977).

> *Evid.R.* 55 states:
>
> Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specific occasion, is inadmissible to prove his disposition to commit crime or civil

wrong as the basis for an inference that he committed a crime or civil wrong on another specific occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

The danger that Evidence Rules 55 and 47 seek to prevent is that a defendant will be prejudiced by evidence of other acts such that a jury will convict because he or she is a bad person disposed to commit crime. *State v. Garfole,* 76 *N.J.* 445, 450–51 (1978).

The evidence in the instant case of other crimes was not offered to show a propensity to commit crime or that the defendant should be convicted because of her bad character. The evidence was offered to explain the circumstances surrounding the death of Theresa Feury and to show that her death was the result of a plan orchestrated and controlled by the defendant. The evidence of the other crimes was relevant to Moore's motives because it helped establish the prosecution's contention that she controlled the events in the house, that one motive was Moore's desire to extort money from victims in the household, and that she rather than Flores controlled what was happening in the household.

The trial court's decision to deny the motion for severance is further supported by two recent Appellate Division opinions, cited by the trial court in making its decision. In *State v. Coruzzi,* 189 *N.J.Super.* 273 (App.Div.1983), the court held:

It is clear that where there is a course of conduct on the part of a defendant such as to make evidence of one transaction relevant to any other transaction for the purpose of establishing motive, intent or common scheme or plan, then the trial judges may properly deny severance. This is because a defendant will not suffer any more prejudice in a joint trial than he would in separate trials, because the evidence of the other alleged crimes would be admissible in any event under *Evid.R.* 55.

[*Id.* at 299 (citing *State v. Kent, supra,* 173 *N.J.Super.* at 220).]

The careful consideration that the trial court gave to the motion further undercuts defendant's contention that the denial was an abuse of discretion. The defendant's position, however, is even further weakened by the jury's verdict acquitting Moore of count twenty-six, attempted murder of Flores, one of the

three pure "post-murder" counts. In *State v. Manney*, the court held that the question with respect to joinder or consolidation was "whether a jury is likely to be unable to comply with the trial court's instruction." 26 *N.J.* at 368. In the instant case, the trial court instructed the jurors that they had to establish the elements to each count separately, and the jury clearly was able to comply as evidenced by the acquittal on count twenty-six and failure to reach a verdict on count two (aggravated assault upon Luis Montalvo) and count thirty-one (burglary of Mrs. Gioia's apartment). In *State v. Hines*, 109 *N.J.Super.* 298 (App.Div.), *certif. den.*, 56 *N.J.* 248 (1970), *cert. den.*, 400 *U.S.* 867, 91 *S.Ct.* 108, 27 *L.Ed.*2d 106 (1970), the Appellate Division rejected defendant's claim that three charges should have been severed, noting that prejudice was not suffered because the jury convicted on one but refused to convict on the remaining two charges. *Id.* at 306; *see also State v. Scioscia*, 200 *N.J.Super.* 28, 43 (App.Div.1985) ("the jury's ultimate verdict, convicting four defendants while failing to resolve the question of guilt or innocence of the others, convincingly demonstrates that they were able to comply with the court's charge").

The absence of prejudice to defendant, Moore, is evidenced by the jury's verdict, and more importantly by the fact that the evidence of these other crimes would have been admissible under *Evid.R.* 55. We are thus persuaded that the trial court's denial of the severance motion was proper. Finally, we note that severing the counts would have entailed a separate trial or trials on these other counts, in which the same witnesses would have had to testify. Thus, interests of judicial economy and efficiency also support joinder of all counts in one trial. Courts may consider such factors when deciding motions for severance, and coupled with defendant's failure to show prejudice, they lend further support to the trial court's decision. *See State v. Manney, supra,* 26 *N.J.* at 366; *State v. Scioscia, supra,* 200 *N.J.Super.* at 42–43. We caution, however, that in a capital murder case the trial court must be careful that the

jury is properly instructed at the outset of the penalty phase that the other counts are not aggravating factors and are not to be considered as evidence of aggravating factors. *See State v. Monturi*, 195 *N.J.Super.* 317, 327 (Law Div.1984). If the trial court believes that proper limiting instructions are not sufficient to protect the defendant from prejudice that would result from the joinder of the offenses, then the trial court must either grant defendant's motion for severance of the indictment or impanel a new jury for the penalty phase.

## C. *Miranda Issue*

Defendant contends that the trial court committed reversible error by admitting into evidence portions of her December 28th statement to police. She claims that portions of that statement were taken in violation of her fifth amendment rights. According to defendant, the Assistant Prosecutor who interviewed her continued to question her despite her request to speak to an attorney. Defendant argues that the statements obtained after this request, in which Moore admitted lying to Theresa's grandmother about Theresa's whereabouts, and claimed Flores made her lie, should have been suppressed, and that their admission was "sufficiently prejudicial to warrant a new trial." The State counters by arguing that Moore withdrew her initial request for counsel, that she re-initiated the conversation, that the Assistant Prosecutor did not coerce her subsequent testimony, and that Moore, after being readvised of her *Miranda* rights, voluntarily, intelligently, and knowingly waived her rights with respect to the statement at issue.

At the *Miranda* hearing, John Laky, Assistant Prosecutor in the Passaic County Prosecutor's Office, was the only witness to testify about the December 28th interview. Laky testified that Detective Stell brought Moore into his office at approximately 3:25 p.m. Detective Stell advised Moore of her rights. Moore stated that she understood her rights, and then signed the forms indicating that she understood and waived her rights.

Assistant Prosecutor Laky then advised Moore again that she was a suspect in Theresa Feury's kidnapping and murder and that he wanted to question her. In response to questions, Moore, after admittedly lying about Billy, stated that Billy was in her mind, that Flores could bring him out, that she did not remember what happened when she became Billy, and that Billy and Flores were close. When Moore admitted that she had been lying and that Billy was in her mind and could be brought out, Laky switched on a tape recorder. At this time, Laky did not tell anyone that he was taping, but when the tape ran out as Moore was describing what Flores did to Theresa Feury, Laky brought the tape recorder out. Moore said she had no objection to being taped. Laky's testimony was based on his review of these tapes, which, though they were somewhat garbled, were understandable after repeated listenings.

After the second tape ran out at 5:25 p.m., Moore asked how she was doing, and in response Laky told her that she was still a suspect and would probably be charged in the murder and kidnapping. Moore was upset by this, stating that she "didn't do it." What follows is the basis for her claim on appeal. Moore then was permitted to go to the bathroom, and on returning stated, "For my own protection, I think I should see an attorney." Laky responded, "Absolutely, you have the absolute right to do that. I will turn the tape off and that will be the end of the conversation." Moore then stated in response, "Okay, I didn't necessarily mean that."

During the ensuing conversation between Moore and Laky, the Assistant Prosecutor repeatedly reminded defendant that she had requested to speak to an attorney and was therefore entitled to discontinue the conversation at that time. When Moore asked Laky what would happen to her if she ended the conversation at that time, Laky responded that whether she continued to speak or not, she would in all likelihood be charged with the murder and kidnapping of Theresa Feury. When Moore insisted that she had done nothing, Laky explained to her that she could be liable for the crimes as an accomplice.

Laky then reminded Moore again that she had an absolute right to remain silent, to which Moore responded that she wished to continue.

Defendant having expressed a desire to continue, Laky informed her that he would need to have Detective Stell advise her of her rights again. Laky also told defendant at that time that he was prepared to honor her request for an attorney, and informed her that an attorney could be provided for her if she did not have one already. In response to defendant's question, Laky told Moore that she would be held in the County Jail while she awaited counsel, adding that she could receive psychiatric treatment there. At that point, Laky turned off the tape recorder, signalling the end of the conversation. Moore immediately expressed her desire to continue the conversation. Laky again reminded defendant that she had an absolute right to remain silent and await counsel. Laky then turned the recorder back on and asked defendant yet again whether she understood her rights and whether she wanted to continue the conversation. After she responded affirmatively, Detective Stell re-advised Moore of her *Miranda* rights, and defendant expressed her willingness to cooperate.

After agreeing to waive her rights again, Moore told Laky more about Theresa's mistreatment, Theresa's death, and how she had tried to help Theresa. These statements were consistent with what she said on December 23rd and are not challenged. Moore also admitted to lying to Theresa's grandmother but blamed Flores for this. Moore claims that the court should have suppressed these statements and that its failure to do so was prejudicial error, requiring reversal of the convictions.

After hearing argument from Moore's counsel and the State regarding Moore's request for an attorney, the trial court rejected defendant's suppression motion. The trial court found that the statement she made *before* her request for counsel was admissible because it was pursuant to a knowing and voluntary

waiver. With respect to the statements following Moore's request for an attorney, the trial court relied on the cases of *Edwards v. Arizona,* 451 *U.S.* 477, 484–85, 101 *S.Ct.* 1880, 1885, 68 *L.Ed.*2d 378, 386 (1981) (interrogation of defendant after request for counsel improper "unless accused himself initiates further communication, exchanges, or conversations with the police"), and *State v. Wright,* 97 *N.J.* 113, 126 (1984) (no valid waiver of right to counsel where "[d]efendant did not initiate further communication with the investigators—he made no inquiry or overture that would demonstrate a desire to discuss the pending charge"). Noting that defendant here initiated the conversation with Laky, the trial court concluded that "the State has established by the totality of the' circumstances and beyond a reasonable doubt that she, again, freely and knowingly waived her *Miranda* rights and voluntarily continued to speak to Mr. Laky."

■ We agree with the trial court's conclusion that it was defendant who initiated the conversation with Laky following her invocation of her right to counsel. Prior to the resumption of that conversation, the police properly reissued *Miranda* warnings to the defendant. *See State v. Hartley,* 103 *N.J.* 252, 267 (1986). We likewise concur with the trial court's further conclusion that she knowingly and intelligently waived her right to counsel. As we stated in *State v. Kennedy,* 97 *N.J.* 278, 286 (1984),

> [i]n making this relevant inquiry, the emphasis has focused upon whether, as an individual, case-by-case matter, a waiver of the right to counsel has been knowing, voluntary and intelligent. *See Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938). As stated in *North Carolina v. Butler, supra,* 441 *U.S.* [369], at 374–75, 99 *S.Ct.* [1755], at 1757–58, 60 *L.Ed.*2d [286], at 293 [ (1979) ], "[e]ven when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.

We are persuaded, as was the trial court, that the totality of the circumstances in the instant case support the conclusion that Moore knowingly and intelligently waived her right to

counsel. Consequently, the court properly admitted the challenged statement into evidence.

## IV.

### Alleged Trial Errors

A. *Charge of Diminished Capacity and Lesser-Included Offenses*

The defendant argues that evidence submitted as part of her insanity defense supported the alternative defense of diminished mental capacity, namely, that a disease of the mind prevented her from "knowingly" or "purposefully" murdering Theresa Feury. Defendant claims that the trial court committed reversible error by failing to instruct the jury that diminished capacity could mitigate murder to aggravated manslaughter. The defendant supplemented this argument following this Court's decision in *State v. Ramseur, supra,* 106 *N.J.* 123 claiming that because the Ramseur jury received an instruction on aggravated manslaughter, the jury below should have received a similar instruction. In *Ramseur,* we rejected the claim that diminished capacity mitigates murder to manslaughter. Instead, we concluded that "diminished capacity does not operate to transform an offense, it can only negate it." *Id.* at 270. In that connection, we observed that "diminished capacity either negates the state of mind required for a particular offense, if successful, or it does not. It either provides a complete defense, if successful, or it does not." *Id.* at 269.

In the recent case of *State v. Breakiron,* 108 *N.J.* 591 (1987), we had occasion to consider in depth the defense of diminished capacity. There, defendant was convicted of murdering a young woman, as well as other related offenses. He presented an insanity defense to all charges and argued that if insanity were not established, the evidence of mental disease or defect still showed that the killing was not "knowing" or "purposeful." *Id.* at 593. The trial court instructed the jury on insanity but refused to instruct that the evidence of mental disease or

defect could be used to negate the required "knowing" or "purposeful" element for murder. *Id.* at 594. In reversing the Appellate Division's split decision affirming the conviction, we held that defendant was entitled to a jury charge that the evidence of mental disease or defect could negate the required elements of purposeful or knowing conduct with respect to the murder charge. *Id.* at 617–18. We thus reversed defendant's murder conviction because the charge to the jury did not allow it to consider whether the evidence presented in the insanity defense negated the elements of murder.

In reversing defendant's conviction in *State v. Breakiron,* we noted that "the diminished capacity defense was designed by the Legislature not as a justification or an excuse, nor as a matter of diminished or partial *responsibility,* but as a factor bearing on the presence or absence of an essential element of the crime as designated by the Code." 108 *N.J.* at 608. Breakiron had argued that by characterizing the diminished capacity defense as an affirmative one, *N.J.S.A.* 2C:4–2 impermissibly shifted to him the burden of disproving an essential element of the crime. We rejected defendant's argument, noting that "when the Code says that mental disease or defect is an affirmative defense that must be proven by a preponderance of the evidence, it does not mean that the defendant must disprove that the act was knowing or purposeful." *Id.* at 611. In our view, the defendant's burden is simply to "show that he or she suffered from a mental disease or defect that is relevant to the mental state of the offense." *Ibid.* Moreover, we concluded that it was not impermissibly unfair to impose that burden on a defendant wishing to avail him or herself of the diminished capacity defense. *Id.* at 612–14. We found support for that conclusion in the fact that "[w]hether or not mental disease or defect is established the State always bears the burden of proving beyond a reasonable doubt the essential mental elements of the crime charged." *Id.* at 613. The defense's "sole function is to establish the absence of an essential element of the crime...." *Id.* at 612.

*Breakiron* also afforded this Court an opportunity to discuss the quality of evidence that would support a charge of diminished capacity: "the only evidence of mental defect or disease that should be admitted on the defense is that relevant to the question of whether the defendant had the requisite mental state to commit the crime." 108 *N.J.* at 618. We also advised trial courts as follows:

Because we agree with the view that diminished capacity as it exists under the Code is "evidence which merely denies the existence of facts which the State must prove to establish [the essential elements of first degree murder]," *State v. DiPaolo, supra,* 34 *N.J.* [279] at 294, we believe that the allocation of responsibility between judge and jury requires that competent reliable evidence be submitted to the jury and that a diminished capacity charge be given to the jury when competent reliable evidence has been offered. [*Id.* at 617.]

In discussing the admissibility of evidence of diminished capacity, we noted in *Breakiron* that "[i]n some cases the evidence clearly will be admissible as part of an insanity defense." 108 *N.J.* at 619. In cases where there is no insanity defense, we advised trial courts to conduct a *Rule* 8 hearing in order to determine the admissibility of proofs. Where an insanity defense has in fact been presented, we advised the trial court to formulate its diminished capacity charge by referring to the standards that we suggested a trial court employ when evaluating defendant's proffer: (1) that the condition defendant purports to establish is relevant to his or her ability to have formed the requisite criminal mental state; (2) that the medical theory underlying the effect of the condition is generally accepted within the scientific community; and (3) that the evidence is relevant to show the existence of the condition. *Id.* at 619. "Whether the defendant's evidence establishes the condition, and whether the condition diminished defendant's capacity to form the requisite criminal mental state, are issues left to the jury as part of its ultimate determination of criminal guilt or innocence." *Id.* at 620.

In the instant case, where defendant did in fact present an insanity defense, the record persuades us that sufficient competent evidence was adduced at trial to support a charge of

diminished capacity. As part of her insanity defense, defendant offered evidence that would permit a jury to decide whether she suffered from a condition that diminished her capacity to form the "knowing" or "purposeful" mental state required to convict her of murder. The trial court, however, instructed the jury only on the insanity defense and did not instruct the jury that the evidence presented as part of that defense could be used to negate the elements of count twenty, the purposeful or knowing murder.

As in *State v. Breakiron*, Moore was charged with both purposeful and knowing murder. In *Breakiron*, we noted that "[t]he former state of mind evidences a conscious object and desire, the latter, that the defendant be practically certain that death would result." 108 *N.J.* at 615. Moore's insanity defense testimony presented evidence that her diminished mental capacity, though perhaps not full legal insanity, negated the "purposeful" and "knowing" elements of the murder charge.

While the main thrust of Moore's insanity defense involved the issue of multiple personality, the defense also introduced evidence of defendant's psychological history in an effort to demonstrate that her mental illness was not a recent fabrication. Defendant introduced a letter that Moore's aunt sent to a neurologist/psychiatrist whom defendant consulted on only one occasion in 1968. Defendant's aunt observes in that letter to the psychiatrist that defendant exhibited characteristics of "split personality." Although not a trained psychologist, defendant's aunt attributed defendant's radically changing disposition to some form of psychological disorder. Defendant also produced the testimony of a psychologist whom she consulted briefly in 1978, Margaret Judge Corny. After finding little physical cause for defendant's seizure ailment, a colleague referred defendant to Ms. Corny in order to determine whether the seizures defendant complained of had a psychological basis. During their consultation, defendant informed Ms. Corny that she had been raped by Mr. Ragusa, a friend's father, that she

had had a bad relationship with her mother, and that she was anxious and unable to work. Moreover, a representative of Caldwell College, where defendant completed one year of study, testified that defendant's teachers had noted in her records that she appeared to have personal problems.

In a further attempt to demonstrate a general background of mental illness, defendant relied on the testimony of Mary Gardullo regarding the latter's stay with defendant in California in 1978. Mary Gardullo testified that she went to California with Moore and Tammy, where they lived in an apartment next door to a woman named Helen, whom Moore befriended. Mary, who by this time knew about and believed that Moore was involved with Billy, learned that Helen was one of Billy's associates. Mary testified that Moore stayed downstairs with Helen while Helen recovered from an operation. Mary heard what sounded like Helen beating and abusing Moore. Mary would try to help Moore but was told to mind her own business, "if you know what's good for you." Mary was also very scared of Helen because Helen was supposedly tearing out Moore's hair, and starving her to satisfy Billy's request that Moore lose weight.

Mary finally left California despite Moore's threats that Billy would bomb her plane if she tried to leave Moore behind. When Mary and Moore met again in New Jersey, Moore told Mary that she had saved her life by convincing Billy not to bomb the plane, and Mary believed her and shortly thereafter moved back in with her. Mary said that Moore came back much thinner, had lost a lot of hair, and had a cast on her leg, which Moore claimed had been fractured. Mary also said that after she moved back in with Moore, the two were close and that she would care for Moore when she blacked out.

Roberta Bayne, Harriet's mother, supported Mary's testimony concerning California. She testified that Moore changed tremendously after coming back from California. Mrs. Bayne testified that she was friendly with Moore in 1976 and that in

1979, after she met Moore again, she told Moore that she felt that Moore had become a "hard, cold woman." Moore replied that this was due to her experiences in California. Roberta Bayne also supported Mary's testimony concerning black-out spells, stating that in 1976 Moore had to have a person with her in case she passed out. This history was used by the defense to counter the charge that Moore was faking and to support the defense experts' testimony that Moore was legally insane.

In addition to evidence of blackouts, defendant introduced evidence of a seizure disorder. In this connection, defendant relied on the testimony of Dr. Dibsie, the physician who had been treating her for seizures since 1978. Dr. Dibsie testified that the medication he regularly prescribed for defendant was used in the treatment of epilepsy. In order to substantiate that claim defendant produced testimony of others who witnessed defendant's seizures. Defendant also produced evidence indicating that she had suffered brain damage, perhaps as the result of a car crash. The defense produced the results of a CAT scan in order to demonstrate that defendant did have brain damage in the form of frontal lobe atrophy. On cross-examination of a State expert, defense counsel established that psychosis could result from head injury.

The defense produced three expert witnesses in support of its contention that Marie Moore suffered from a multiple personality disorder. Dr. Charles Opsahl, a clinical psychologist and faculty member of the Yale University School of Medicine, conducted intelligence quotient, personality, and neuro-psychological tests of defendant. During his interview with defendant, the personality of Billy also appeared. He conducted similar tests of the Billy personality, and observed that those test results differed from the results obtained when he tested Marie. Based on this observation, as well as other observations concerning differences in behavior between Marie and Billy, Dr. Opsahl believed that defendant suffered from a multiple-personality disorder. He was also persuaded that defendant had some brain damage. Opsahl's professional opinion was that

defendant was thus legally insane because she did not know right from wrong when she was Billy.

Dr. Dorothy Lewis, a board certified psychiatrist from New York University, administered similar tests. She also spoke with Billy who informed her that defendant's father raped her during childhood, that her father drank heavily and beat defendant's mother, and that a Mr. Ragusa had also raped defendant. Dr. Lewis concluded that Billy was psychotic, delusional, and was filled with very violent fantasies. After observing that the Billy personality exhibited traits of paranoid schizophrenia, Dr. Lewis explained that this meant that defendant also had such traits in her own personality. Dr. Lewis' expert conclusion was that defendant suffered from a multiple-personality disorder brought on by her history of sexual abuse.

Dr. James Merikangas, also on the faculty of the Yale University School of Medicine, was the final defense expert. He, too, was board certified in neurology and psychiatry. Dr. Merikangas conducted neurological tests of defendant, and interpreted CAT scan results to show that defendant had "significant" atrophy of frontal lobe brain tissue. Dr. Merikangas observed that defendant had hallucinations, grandiose delusions, and was frequently out of touch with reality. Based on his tests and observations, he concluded that defendant was psychotic and suffered from a multiple-personality disorder. He thus determined that she was legally insane.

Given the nature and extent of the testimony elicited with regard to the insanity defense, we are persuaded that ample evidence existed to support a charge to the jury that a finding of diminished capacity could negate the "knowing" and "purposeful" elements of murder. We believe there was sufficient evidence to warrant a diminished capacity charge, particularly when we " 'view[ ] the evidence and legitimate inferences to be drawn therefrom in the light most favorable to defendant....' " *Breakiron, supra,* 108 *N.J.* at 617. Accordingly, we find that the trial court committed reversible error by

failing to charge the jury that diminished capacity could negate the knowing or purposeful elements of the murder count. We so find despite the fact that defendant did not request such an instruction. As we made clear in *Ramseur*, "the trial court has a duty 'to charge the applicable law to the jury based upon facts regardless of what requests counsel may make....' " 106 *N.J.* at 270–71 n. 62. Defendant had presented sufficient evidence at trial to warrant a diminished capacity instruction, an instruction that would have permitted the jury to determine whether the State had proved the "knowing" and "purposeful" elements of murder beyond a reasonable doubt. This is particularly relevant in this case where the defendant sought and was denied a charge on manslaughter and aggravated manslaughter.

We also find reversible error in the trial court's failure to charge the jury with respect to aggravated manslaughter and manslaughter, as defendant had requested. Our review of the record persuades us that the evidence at trial would have warranted the jury's consideration of an aggravated manslaughter charge, particularly if the jury had believed that defendant's diminished capacity negated the knowing and purposeful elements of murder. Because the trial court failed to charge the jury with respect to diminished capacity and the lesser-included offense of manslaughter, we reverse defendant's murder conviction.

It is clear that "[a] charge on a lesser-included offense cannot be automatically given to a jury when the defense of diminished capacity is raised by a defendant." *Ramseur, supra,* 106 *N.J.* at 269. However, "negating the mental state for murder by producing evidence of mental disease or defect does not prohibit a conviction for manslaughter provided the essential elements of that crime are present." *Breakiron, supra,* 108 *N.J.* at 610. As we noted in *Ramseur*, "the 'included offense' statute, *N.J.S. A.* 2C:1–8(e), specifically states as to lesser-included offenses that the court shall not charge the jury with respect to an

included offense *unless there is a rational basis for a verdict convicting the defendant of the included offense.*" 106 *N.J.* at 269.

Our characterization of the interplay between the diminished-capacity and lesser-included offense instructions in *Ramseur* is relevant to our disposition of the instant case. There we found:

> The trial court charged on aggravated manslaughter in this case not because diminished capacity could reduce the offense from murder to aggravated manslaughter, but because evidence warranted consideration of aggravated manslaughter by the jury in the event it was unpersuaded that defendant had acted "purposely" or "knowingly." The trial court determined, and we agree, that if the jurors did not find knowing and purposeful conduct, they should then appraise the evidence to determine whether defendant acted with a "conscious disregard of a substantial and unjustifiable risk," *N.J.S.A.* 2C:2-2, "under circumstances manifesting extreme indifference for human life," *N.J.S.A.* 2C:11-4—the constituent elements of manslaughter.
> [106 *N.J.* at 269-70.]

In the instant case, the trial court should have instructed the jury that if it did not find knowing or purposeful conduct, it should then appraise the evidence to determine whether defendant was guilty of manslaughter.

Our review of the record persuades us that there was sufficient evidence to establish the essential elements of manslaughter—certainly enough to warrant a charge under our law. In *State v. Crisantos*, 102 *N.J.* 265, 275 (1986), we noted that the decision to charge a lesser-included offense was governed by *N.J.S.A.* 2C:1-8(e):

> The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.

As we noted in *Crisantos*, "the rational-basis test of the Code imposes a low threshold ... for permitting a charge on a lesser-included offense." *Id.* at 278. We thus held that "[w]hen the lesser-included offense charge is requested by a defendant, as in this case, the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational basis standard has been satisfied." *Ibid.* (citations omitted). Here, defendant asked the trial court to

charge the jury with respect to the lesser-included offenses of manslaughter and aggravated manslaughter. We find that there was evidence in this case that would have afforded the jury a rational basis for convicting defendant of manslaughter.

The two potential lesser-included offenses for the murder count are manslaughter and aggravated manslaughter, and are defined statutorily by *N.J.S.A.* 2C:11–4:

a. Criminal homicide constitutes aggravated manslaughter when ·the actor recklessly causes death under circumstances manifesting extreme indifference to human life.

b. Criminal homicide constitutes manslaughter when:

(1) It is committed recklessly, or

(2) A homicide which would otherwise be murder under section 2C:11–3 is committed in the heat of passion resulting from a reasonable provocation.

Because we find no evidence that would give rise to a rational basis to convict defendant of passion/provocation manslaughter, we will limit our discussion to the aggravated and reckless forms of manslaughter, for which we do find evidence in the record.

The Code defines reckless conduct as follows:

*A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.* The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.

[*N.J.S.A.* 2C:2–2(b)(3).]

The State argues that the evidence supports only the verdict of knowing and purposeful murder because Moore told Theresa that she would never leave, because Theresa was starved over her last month, because each day physical violence was knowingly and purposefully inflicted on Theresa, and because defendant presented only evidence of insanity as a defense. Defendant argues that there is sufficient evidence to raise a legitimate question of whether Moore ever intended to kill Theresa. Admittedly, Theresa Feury, starved and continually punished, was in a seriously deteriorated medical condition on

the day of her death. Nonetheless, she died not from these causes but rather from injuries she sustained as a result of being accidentally dropped by Ricky. Moreover, defendant alleges that Moore's encouragement and orders to Ricky to inflict punishment on and withhold food from Theresa manifested an "extreme indifference to human life," rather than an intent to kill.

We find that a jury could have reasonably concluded that defendant acted recklessly in bringing about Theresa's death. Furthermore, the record below provided a rational basis on which a jury could have found that Moore caused Theresa's death by consciously disregarding a substantial and unjustifiable risk that the girl's death, the material element, would result from her pattern of conduct. One incident that could have persuaded the jury that defendant behaved recklessly, rather than knowingly or purposely, occurred several weeks before the girl's death. After weeks of confinement, continued abuse, and starvation, Theresa lost consciousness while cuffed in the kitchen. The evidence shows that Moore became alarmed and tried to bring Theresa out of her seizure. After ensuring that Theresa regained consciousness, defendant recuffed the victim in the kitchen. Evidence of this type might have persuaded a jury of two things: (1) that defendant did not intend that Theresa die; and (2) that by recuffing the victim once she regained consciousness, defendant resumed the pattern of conduct that she feared had caused the girl's death, thus supporting the view that defendant consciously disregarded a substantial and unjustifiable risk that the pattern of conduct would result in Theresa's death. It is also likely that a jury could have reasonably concluded that the pattern of conduct leading to Theresa's death manifested extreme indifference to human life.

The immediate cause of the victim's death lends further support to our conclusion that a rational basis existed for a jury to convict defendant of manslaughter. According to the medical examiner, the victim died as a result of blows to her head

and face. The evidence indicates that the victim received those deadly blows when Flores attempted to pick the victim off of the bathroom floor and then released her, causing her head to strike the bathtub. On the morning that this incident occurred, defendant had instructed Flores to remove Theresa from the bathroom in order to allow her daughter Tammy to ready herself for school. Flores testified that ordinarily he would uncuff Theresa from the bathroom floor and she would walk to the kitchen on her own, where she would be recuffed for the remainder of the day. Flores testified that on the morning of her death, however, Theresa did not get up on her own. Consequently, he lifted her to her knees by her shoulders and released her, expecting that she would then walk to the kitchen as usual. Instead, she fell forward and hit her head on the tub.

Given these facts, a jury could have reasonably concluded that defendant did not "knowingly" or "purposefully" cause the victim's death *in this manner,* but rather that defendant recklessly engaged in a pattern of conduct that manifested extreme indifference to human life and resulted in death. As this court stated in *Ramseur,* the trial court should charge the jury regarding " 'all of the possible offenses that might reasonably be found from such facts.' " 106 *N.J.* at 270–71 n. 62 (quoting *State v. Choice,* 98 *N.J.* 295, 298–99 (1985)). The trial court's failure to follow that directive in the instant case by refusing to charge the jury on manslaughter and aggravated manslaughter requires us to reverse defendant's murder conviction.

The juvenile court's decision to accept Flores' manslaughter plea provides further support for defendant's claim that there was a rational basis on which a jury could have found manslaughter or aggravated manslaughter. The defendant argues that Flores inflicted the punishments on Theresa Feury and "caused her death by his own conduct," and was thus as culpable as Moore. By agreeing to accept his plea, defendant argues, the State conceded that "manslaughter is a possible crime to be found in the case *sub judice.*"

The juvenile court's decision on whether or not to accept a plea is governed by *Rule* 3:9–2, made applicable to the Family Court by *Rule* 5:1–1. *State in the Interest of G.W.*, 206 *N.J.Super.* 50, 54 (App.Div.1985); Pressler, Current N.J. Court Rules, *Comment R.* 5:1–1. *Rule* 3:9–2 provides in relevant part:

> A defendant may plead only guilty or not guilty to an offense. The court, in its discretion, may refuse to accept a plea of guilty and shall not accept such plea without first addressing the defendant personally and determining by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea and that the plea is made voluntarily, not as the result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea. When the defendant is charged with a crime punishable by death, no factual basis shall be required from the defendant before entry of a plea of guilty to a capital offense or to a lesser included offense, provided the court is satisfied from the proofs presented that there is a factual basis for the plea.

Under this Rule, the Family Court had to find that there was a factual basis for Flores' manslaughter plea. Flores, however, is not similar to Moore in that he did not direct or control the household, was a juvenile at the time, and acted at Moore's direction. Nonetheless, Flores meted out almost all of the punishments, exercised discretion in how many times he would hit the victims, and designed some of the punishment on his own, albeit to please Moore and Billy. Moreover, prior to the plea agreement the prosecutor was prepared to seek a waiver from Family Court and try him as an adult for Theresa Feury's murder. Thus, the fact that the Family Court would accept Flores' plea of guilty to manslaughter shows that a factual basis for his plea existed and offers some support to Moore's argument that the jury should have been given the option to find her guilty of a lesser-included offense.

### B. *Admission of Victim's Photographs*

Moore argues that the trial court's decision to admit three photographs of Theresa Feury, one from a school yearbook, and two photos of the wrapped corpse as it was discovered by police constitutes reversible error. Defendant argues that the photo-

graphs were highly prejudicial and had no probative value, so that under *Evidence Rule* 4 they should not have been admitted. Moreover, defendant argues that the prejudicial nature of the photographs of the corpse was exacerbated when juxtaposed with the school photograph, which showed Theresa Feury as a healthy school girl.

The State argues that the photographs were relevant and probative in that they supported and confirmed the testimonial evidence of Flores and Detective Stell. The State argues further that the photographs of the corpse, which showed only the form of a body wrapped in tape and bags, were not gruesome. The State also points out that the prosecutor did not use the photographs in summation, thus lessening the potential for prejudice. Finally, the State argues that the trial court's decision to admit the photographs was well within its discretion.

After initially failing to object to the admission of the school photograph, the defense withdrew its approval and argued instead that the photograph was irrelevant, highly prejudicial, and served only to invoke sympathy. The trial court admitted the photograph, finding that it was relevant and not prejudicial to the defendant.

The trial court on the following day considered the admissibility of the two photographs of the wrapped corpse. These photographs were small, color Polaroid shots of what is best described as the form of a body wrapped in tape and plastic. One of the photographs depicted an object wrapped in a quilt that was lightly stained and secured with rope. At the bottom of the object, plastic bags could be seen protruding from beneath the quilt, with duct tape wrapped around some of the plastic bags. The object depicted was situated on a wood floor with a couple of photographs, a pack of matches, and a piece of rope on the floor behind it. In the background of the photograph, one could see that a section of the wall panelling had been removed, uncovering an empty and dark space behind it.

The second photograph of the wrapped corpse depicted a similar background. This photograph, however, showed the object in plain view, the quilt having been removed. One could see in this photograph that the quilt was replete with dark red or brown stains. The second photograph also depicted a dark stain near the bottom of the object that was not shown in the first photograph. This photograph made clear that the image depicted was in fact a human body wrapped from head to foot with silver duct tape. Although the photograph did not reveal any body parts, one could see a good deal of white powder surrounding the head area of the body.

After hearing argument from counsel, the trial court ruled as follows:

I reviewed 35 and 36. I find that neither photograph is gruesome. I find that they are both relevant. There has been testimony in the case concerning the manner in which Theresa Feury's body was wrapped. And both will be admitted in evidence.

*Evidence Rule* 4 governs the admissibility of such evidence and states as follows:

The judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury.

The trial court's decision to admit the photographs under *Evidence Rule* 4 is entitled to deference and should be reversed only on a finding that the court abused its discretion, thus resulting in a manifest denial of justice. *See State v. Carter*, 91 *N.J.* 86, 106 (1982).

We have held that photographs of victims are admissible unless defendant can show that the trial court palpably abused its discretion. *See State v. Carter, supra*, 91 *N.J.* at 106; *State v. Thompson*, 59 *N.J.* 396 (1971); *State v. Royster*, 57 *N.J.* 472, 485, *cert. den.* 404 *U.S.* 910, 92 *S.Ct.* 235, 30 *L.Ed.*2d 182 (1971); *State v. Conklin*, 54 *N.J.* 540, 545–46 (1969). A review of those cases shows that wide discretion is given to the trial court's determination.

In *State v. Thompson, supra,* 59 *N.J.* at 419–20, we upheld the trial court's admission of a photograph of the victim lying on her back with sizable bloodstains close by and a can of mace, with which she had supposedly tried to stop her attacker, just inches from her right hand. In *State v. Royster, supra,* 57 *N.J.* at 485, the Court held that the admission of a photograph that depicted the victim "bare from the groin up and showed the point of entrance of two of the bullets which struck her," was not an abuse of discretion because the photograph had probative value and was not unduly inflammatory. Similarly, in *State v. Conklin, supra,* 54 *N.J.* at 545 the black and white photographs of the two victims showing the husband bound and blindfolded clad only in undergarments, and the nude bloodied body of his wife with a severely lacerated ear were admissible because they were relevant and within the trial court's discretion. *See also State v. Vujosevic,* 198 *N.J.Super.* 435, 448 (App.Div.) (color photographs of decedent's brutally beaten body probative on defendant's conduct), *certif. den.,* 101 *N.J.* 247 (1985); *State v. Hardison,* 204 *N.J.Super.* 1, 12 (App.Div. 1983) (photograph showing extent of injuries to victim properly admitted), *aff'd,* 99 *N.J.* 379 (1985); *cf. State v. Jasuilewicz,* 205 *N.J.Super.* 558, 575 (App.Div.1985) (color photo of victim's nude body inadmissible where wounds already in evidence), *certif. den.,* 103 *N.J.* 467 (1986).

■ We find that the trial court did not abuse its discretion by admitting the photographs of the wrapped corpse into evidence. The two photographs of the wrapped corpse clearly had probative value because they corroborated Flores' testimony regarding the disposal of the body, as well as the testimony of Detective Stell regarding its discovery. The photographs were neither gruesome nor inflammatory. Moreover, given the overall evidence of brutality put before the jury, these photographs hardly could have prejudiced the jury.

■ While the admissibility of the school picture is more questionable, that photograph alone, or in conjunction with the

two photographs of the corpse, could not prejudice a jury that had already heard testimony exhaustively detailing the torture and other abuses that Moore and Flores inflicted on Theresa and the other victims. Moreover, the prosecutor did not refer to the photographs in summation, nor did he use them to inflame the jury during the trial. Hence, the potential for any prejudice is further lessened.

In sum, given the context in which these photographs were admitted, the non-prejudicial nature of the photographs of the corpse, and the balance of the evidence in the case, we find that the trial court's decision to admit the photographs did not constitute an abuse of discretion.

C. *"Own Conduct" Requirement of N.J.S.A.* 2C:11–3c

At the close of the State's case-in-chief, defendant moved for judgment of acquittal on various grounds. As part of that motion, defendant urged the court to dismiss the murder count and preclude the State from continuing to seek the death penalty. With regard to preclusion of the death penalty, defendant argued that the State had failed to prove that she committed the homicidal act "by her own conduct" in accordance with *N.J.S.A.* 2C:11–3c. Defendant's argument with respect to the "own conduct" requirement consisted of two principal points: (1) it was Ricky Flores, not defendant, who inflicted the various punishments, including the death blow; and (2) the Legislature, in formulating the "own conduct" requirement, expressed its intent to narrow the death-eligible class to those persons who wielded the instrumentality of death or who struck the death blow. According to defendant, the Legislature intended to exclude from the death-eligible class defendants whose culpability was premised on a theory of accomplice liability.

The State argued that defendant's reading of the legislative history was too narrow. If the Legislature had wanted to limit the death-eligible class to those who strike the fatal blow, the

State argued, it would have required that the murder be committed by one's "own hand," rather than by one's "own conduct." According to the State, then, the "own conduct" requirement encompassed the defendant's actions over a period of time in bringing about Theresa's death, namely, defendant's conduct in directing Ricky Flores to inflict the punishments that ultimately resulted in the victim's death.

In denying defendant's motion to preclude the State from seeking the death penalty, the trial court relied on its interpretation of the legislative history, as well as the Code's definition of "conduct" under *N.J.S.A.* 2C:1-14. The trial court also concluded that if the jury were to find defendant guilty of murder, it could reasonably conclude that she had committed the homicidal act "by her own conduct."

During pre-charge proceedings, defense counsel urged the trial court to instruct the jury that it could find that defendant had committed the homicidal act "by her own conduct" only if persuaded that her conduct was the "immediate, clear, and present cause of death." The trial court denied that request, and charged the jury as follows:

> If you find the defendant guilty of murder, you must then determine whether the State has proved beyond a reasonable doubt whether the defendant committed the homicidal act by her own conduct. The State must prove the following beyond a reasonable doubt: One, that the defendant participated in an act or series of acts which caused the death of Theresa Feury. Two, without the defendant's participation in that act or series of acts, Theresa Feury would not have died. Three, the defendant intended to cause the death of Theresa Feury or to cause serious bodily injury to Theresa Feury which resulted in her death.

In keeping with the trial court's instructions, the jury returned separate verdicts with respect to the murder count: (1) that defendant was guilty of knowing and purposeful murder; and (2) that she committed the homicidal act by her own conduct.

On appeal, defendant continues to argue that the evidence failed to establish that she committed the homicidal act "by her own conduct." In addition, she argues that the trial court's charge with regard to that requirement was improper.

*N.J.S.A.* 2C:11–3c provides, in pertinent part, that "[a]ny person convicted under [*N.J.S.A.* 2C:11–3(a)(1) or (2) ] *who committed the homicidal act by his own conduct* or who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value shall be sentenced" in accordance with the Act's capital punishment provisions. (Emphasis added). In *State v. Gerald,* 113 *N.J.* 40 (1988), we for the first time interpreted the meaning of the "own conduct" requirement. The victim in *Gerald* died as a result of multiple beatings administered by more than one person during the course of a burglary. Because the medical testimony failed to establish whose blows resulted in the victim's death, Gerald argued that he was not death-eligible. He contended that the death penalty was proper only for an actor who " 'directly causes death by his own conduct, without reference to the acts of co-defendant .' " *Id.* at 92. We agreed that a defendant must be the direct and immediate cause of death in order to satisfy the "own conduct" requirement but rejected defendant's contention that the "single relevant concern [was] whether the defendant's conduct, *standing alone,* caused the victim's death." *Id.* at 92 (emphasis added). Instead, we concluded that the "relevant inquiry is whether or not the defendant *actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died. The critical elements are that defendant in fact acted, and the immediacy of his conduct to the victim's demise." *Id.* at 97.

Although this case is unlike *Gerald* in that it does not involve death by multiple beatings, our interpretation in that case of the "own conduct" requirement is relevant here. In *Gerald,* we held that in order to satisfy the "own conduct" requirement, the State had to prove beyond a reasonable doubt that defendant's conduct was the *direct and immediate cause of death.* Our decision to limit the death-eligible class in this manner was based on our interpretation of the legislative history of the Act. *Gerald, supra,* 113 *N.J.* at 93–96. As we noted in *Gerald,*

Senator John Russo, chief sponsor of the bill, intended that only two class of murderers be subjected to the death penalty: " '[ (1) ] the actual perpetrator of the murder, the one who wields the gun or the knife * * * that results in death * * * [and (2) ] the one who hires one to commit murder....' " *Id.* at 94 [ (quoting *Capital Punishment Act: Hearings on S.112 Before the Senate Judiciary Committee* (1982) at 2 (hereinafter *Committee Hearing*) ].

■ Although the Code and the common law have abolished the distinction between principal and accomplice, we noted in *Gerald* that by adopting the "own conduct" requirement the Legislature reinstated the distinction for purposes of capital punishment. 113 *N.J.* at 96. We were persuaded that it was the Legislature's intent to preclude death-eligibility where a defendant's murder conviction was based on a felony murder charge or a theory of accomplice liability, unless, as *N.J.S.A.* 2C:11–3 expressly provides, defendant hired another to commit the murder. Other than that very narrow "murder for hire" exception, only the principal, *i.e.*, the "triggerman," shall be death-eligible. Consequently, we concluded that "[a]n accomplice who neither takes part in the infliction of the fatal wounds nor hires another to commit the murder may properly be convicted of murder, but may not be sentenced to death for his or her conduct." *Id.* at 93. However, the Legislature made clear its intention that "[b]ecause the triggerman 'is the fellow that ended somebody's life,' he alone should face a possible death sentence." *Id.* at 95 (quoting *Committee Hearing* at 18). In *Gerald* we concluded that although "the imputation of liability for the conduct of another suffices for a murder conviction, the defendant's 'own conduct' in the commission of the murder is a prerequisite to imposition of the death penalty." *Id.* at 96.

It must be pointed out that the "own conduct" requirement is a triggering device used to determine whether a defendant will be death-eligible. Failure to satisfy the own conduct require-

ment does not render a murder conviction invalid. Moreover, we recognize that the federal constitution does not require us to conclude that an accomplice cannot be death-eligible. In *Tison v. Arizona*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), the Supreme Court recently limited the application of the rule announced in *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982), where the Court had held that it was disproportionate to impose the death penalty on a person convicted of felony murder without finding an intent to kill. In *Tison*, the Supreme Court distinguished *Enmund* on the grounds that the defendant in the latter case had been a minor participant, while the defendants in *Tison* were major participants in the events leading to the murders. The Court noted that the Tison brothers helped their father and his cellmate escape (these two shot the victims), knew of the danger involved, supplied guns, and flagged down the victims' car. Consequently, the Court concluded that the Tison brothers had been more than minor participants in the killings. The Court held in *Tison* that the defendants, who had been convicted under Arizona's felony-murder law and accomplice liability statutes, were properly deemed death-eligible, and thus affirmed their death sentences.

As noted earlier, our death penalty scheme disallows the result reached in *Tison*, unless a defendant has hired another to commit murder. It is well-established that states are free to provide greater protection in their criminal justice system than the federal constitution requires. *See California v. Ramos*, 463 *U.S.* 992, 1013–14, 103 *S.Ct.* 3446, 3459–60, 77 *L.Ed.*2d 1171, 1188–89 (1983); *Ramseur, supra*, 106 *N.J.* at 167. Under our statute, the Tison brothers would not be subject to the death penalty.

■ In light of our interpretation of the "own conduct" requirement, we must examine the evidence in this case to determine whether it is sufficient to establish that Moore *actively and directly participated* in the homicidal act, *i.e.*, in the

infliction of the injuries that caused the victim's death. We are compelled to conclude that the facts in evidence do not support the jury's findings that Moore committed the homicidal act "by her own conduct."

The State recognizes that Moore did not inflict the fatal blows that resulted in the victim's death. Nonetheless, the State argues that Moore was the architect behind the death of Theresa Feury, a death whose cause cannot be properly limited to the moment the victim fell and hit her head on the bathtub. Rather, the State urges the Court to view Moore's participation in causing the death of Theresa Feury in light of her entire conduct over a period of time:

> The homicidal act need not be, as clearly demonstrated by this case, a single act of stabbing or shooting but may equally occur by a series of acts and omissions. The one responsible for that series of acts and omissions, as was Marie Moore so found to be by the jury's verdict, is to be justly deemed the "perpetrator" of that murder, the one who committed it "by her own conduct" regardless that the last physical act culminating in death (i.e. the lifting up of Theresa Feury on her knees to then fall and strike her head and the subsequent wrapping of Feury) was not by defendant's own hand.

If the medical evidence established that Theresa Feury's death was caused by starvation or her weakened medical condition, or by asphyxiation resulting from her being wrapped and stuffed in a crawl space while alive, we would agree with the State that a jury could find that Moore "by her own conduct" caused Theresa's death. Under those facts, a jury could find that Moore "actively and directly participated in the infliction of the injuries from which the victim died."

The medical evidence presented in this record, however, does not support that finding. According to the medical examiner, the victim died as a result of blows to the head and face caused by striking the tub. Marie Moore did not deal the victim those fatal blows. Even the prosecutor conceded that point during legal argument: "There is no question about the fact that when Theresa Feury died it wasn't ... at her hand. There is no question about that fact." That Moore solicited and then directed Flores' participation does not alter the result we reach

today. By limiting death-eligibility to the actual "triggerman," the Legislature expressly rejected the notion that one who solicits another to kill without payment or promise of payment should be death eligible. See *Gerald, supra,* 113 *N.J.* at 92–97.

Given our disposition of the "own conduct" issue in the instant case, we find it unnecessary to address at length defendant's claims with regard to the trial court's "own conduct" jury charge. We find however that the jury charge given in this case was improper. It made the defendant eligible for the death penalty by virtue of her role as an accomplice. *Supra* at 97–98. Accordingly, in this case, we find that the trial court erred by denying defendant's motion to preclude imposition of the death penalty based on the State's failure to prove that she had committed the homicidal act by her own conduct.

## V.
### Penalty Phase & Sentencing Challenges

Defendant raises two penalty-phase arguments that we have rejected elsewhere and that we reject here again. These include (1) that fundamental fairness requires that defendant make the initial opening statement and trial summation at the penalty phase, *State v. Ramseur, supra,* 106 *N.J.* at 318 n. 81; and (2) that a defendant's constitutional rights are violated by the lack of any finding that death was the appropriate punishment. *Id.* at 316–17 n. 80.

### A. *Weighing of Aggravating and Mitigating Factors*

The State concedes that the charge on the weighing of aggravating and mitigating factors did not conform with the standards defined in *State v. Biegenwald, supra,* 106 *N.J.* at 53. The charge in the instant case did not require the jury to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Were we not reversing

defendant's murder conviction, this shortcoming would provide independent grounds to vacate the death sentence. Consequently, we find it unnecessary to address defendant's claims with regard to the court's instructions on aggravating factors c(4)(c) and c(4)(f). We likewise find it unnecessary to address defendant's contention that a second jury should have been impanelled for the penalty phase trial pursuant to *N.J.S.A.* 2C:11–3c(1).

B. *Seating of Alternate Penalty Phase Juror & Instruction to Deliberate Anew*

Just prior to the start of the penalty phase, the trial court received a doctor's note indicating that one juror, Mr. Sessler, was very nervous and had health problems that might worsen if he continued to serve on the jury. Without objection from counsel, the trial court discharged the juror. The court convened the jury to start the penalty phase, and told the remaining fourteen jurors (one had already been excused during the guilt phase when he recognized that an expert witness was a family doctor) that Mr. Sessler had been released and that at the close of the penalty phase one of the three alternates would join the eleven remaining guilt phase jurors in penalty phase deliberations.

As part of her motion for a new trial on January 3, 1985, defendant argued that the trial court committed reversible error by failing to instruct the jury that it had a duty to deliberate anew on the guilt phase charges with the alternate juror. The trial court rejected this argument, finding no evidence of prejudice to defendant. On appeal, defendant raises the same argument, claiming that the trial court's failure to instruct the jury to deliberate anew constitutes plain error. Defendant reads *State v. Trent,* 79 *N.J.* 251 (1979), to require the trial court to give such an instruction whenever a juror is substituted during deliberations. Moore claims that the alternate was substituted during deliberations because the guilt phase and penalty phase deliberations were linked, given the

recognized impact of lingering doubt concerning a defendant's guilt in penalty phase deliberations, see *Ramseur*, 106 *N.J.* at 254, and the fact that guilt phase evidence was used in the penalty phase.

The State argues that defendant's claim fails because no objection was made by trial counsel, and that prejudice, if any resulted, was sustained by the prosecution because the alternate juror selected might have had reasonable doubt concerning murder, unlike the twelve who voted to convict, and so could have brought that doubt in as a new juror and voted for a life verdict. This argument was adopted by the trial court in rejecting the motion. The State argues further that penalty-phase deliberations are separate from the guilt phase, thus distinguishing *Trent*. Further, the State points out that a 1985 amendment to *N.J.S.A.* 2C:11–3c(1), which was not in place at the time of trial, expressly authorizes this kind of substitution without requiring any instructions. The Attorney General as amicus argues the same points, but adds that the court must find the failure to instruct to be plain error because it was not objected to at trial.

 We find no error, plain or otherwise, in the trial court's "failure" to instruct the jury to deliberate anew upon seating an alternate juror for the penalty phase proceeding. We are not persuaded that *State v. Trent* is dispositive in the instant case. In fact, we find that that case is readily distinguishable. There, an alternate juror replaced a juror who fell ill *during* the jury's deliberations. We held, per Justice Clifford, that the trial court's failure to instruct the jury to begin deliberating again and to disregard prior deliberations constituted reversible error. This Court reasoned " 'that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity.' " 79 *N.J.* at 256 (quoting *People v. Collins*, 17 *Cal.*3d 687, 689, 131 *Cal.Rptr.* 782, 786, 552 *P.*2d 742, 746 (1976), *cert. den.*, 429 *U.S.* 1077, 97 *S.Ct.* 820, 50 *L.Ed.*2d 796 (1977)); *see also*

*State v. Corsaro,* 107 *N.J.* 339 (1987) (juror substitution after partial verdict returned constituted plain error requiring reversal of convictions on "open charges" arrived at after substitution of juror). In the instant case, Mr. Sessler was not replaced until *after* the jury had considered and reached a determination regarding all the various charges brought against defendant.

Defendant's argument that the guilt and penalty phases are linked such that a final verdict in the guilt phase should be disregarded if a juror takes ill is not persuasive in light of the statute's bifurcation of guilt and penalty phases. Prior to the 1985 amendment, *N.J.S.A.* 2C:11-3c(1) provided that there would be a separate sentencing procedure conducted by the jury that determined guilt or innocence, "except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding." This provision shows that a divided process was intended by the Legislature, in which even separate juries could, for good cause, try the guilt and penalty phases. This legislative purpose is not consistent with defendant's argument that the substitution occurred *during* deliberations, because the split between guilt and penalty phase determinations shows the two were and are separate. Thus, there is no need to instruct the jury to begin deliberations anew under *Trent* or under the statute.

The 1985 amendment to *N.J.S.A.* 2C:11-3c(1) offers further support for the State's position because it explicitly authorizes the type of substitution made in the instant case without even mentioning that deliberations should begin again. The amendment adds to this subsection the following provision:

Nothing in this subsection shall be construed to prevent the participation of an alternate juror in the sentencing proceeding if one of the jurors who rendered the guilty verdict becomes ill or is otherwise unable to proceed before or during the sentencing proceeding.

The defendant's claim that the guilt phase and penalty phase deliberations are not distinctive is weakened further by this court's decision in *Biegenwald.* There, we held that re-sentenc-

ing was proper using a newly selected jury, and distinguished precedent under the prior capital murder statute, particularly *State v. Laws*, 51 *N.J.* 494, *cert. den.*, 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968), which had rejected re-sentencing on penalty alone, stating:

> Because *Laws* was decided under a unitary trial statute and because the *Laws* Court's major misgiving about a separate trial on the issue of penalty—the foreignness of bifurcation—has been removed, *Laws* is not controlling precedent for the present case. [106 *N.J.* at 69-70.]

Thus, the *Biegenwald* court, as well as the *Ramseur* court, recognized that the capital murder statute set up a bifurcated system in which guilt and penalty phases are separate. Because neither the relevant case law nor the capital murder statute itself supports defendant's position, we find no error in the trial court's failure to instruct the jury to deliberate anew.

C. *Proportionality of Defendant's Sentence vis-a-vis that of Richard Flores*

Today we reverse defendant's murder conviction, and agree that the trial court's erroneous penalty-phase instructions would have provided independent grounds to vacate the death sentence. Despite that disposition, we will nonetheless briefly address defendant's proportionality argument. Defendant argued repeatedly to the jury that Flores was the more culpable party, and that his "deal" with the prosecutor was unfair, especially in light of the penalties she was to face. On appeal, Moore argues that her death sentence must be vacated because it is disproportionate to the sentence imposed on her co-perpetrator, Ricky Flores. According to defendant, the prosecutor was unauthorized to enter into a plea agreement with Flores that would permit him to escape prosecution for capital murder.

To support her argument that the prosecutor's plea bargain with Flores was impermissible, defendant relies on our interpretation of the Act in *Ramseur*. We noted there that "[t]he Act prevents potential capital defendants from avoiding a capital sentencing proceeding by pleading guilty to the murder charge." 106 *N.J.* at 195. That statement assumes, of course,

that the defendant who would otherwise plead guilty to capital murder is in fact death-eligible. In *State v. Bey (I)*, 112 *N.J.* 45, 93–94 (1988) we held that "[i]t is patently clear to us that the Legislature never had intended to subject juvenile offenders to capital punishment, and did intend that its ameliorative amendment would apply retroactively to defendant's case." *See N.J. S.A.* 2C:11–3g. We thus reversed defendant Bey's capital murder conviction in order to comply with the legislative intent. Because Flores was a juvenile at the time of the murder, he is not within the death-eligible class of murderers who would be considered in a proportionality review of Moore's sentence. Consequently, defendant's proportionality claim is without merit.

 We likewise reject defendant's contention that the prosecutor's plea agreement with Flores was unauthorized under the Act, namely, *N.J.S.A.* 2C:11–3d. That section provides that "[t]he sentencing proceeding set forth in subsection c. of this section shall not be waived by the prosecuting attorney." This section obviously requires a death-penalty proceeding where a person pleads guilty to capital murder. Here, however, Flores was not even eligible to plead guilty to capital murder, and instead pleaded guilty to a lesser offense. Our concern in *Ramseur* and the concern of the Legislature as reflected in *N.J.S.A.* 2C:11–3d was not to prevent persons from pleading guilty to lesser offenses, but rather to prevent prosecutors from coercing defendants into pleading guilty to capital murder in order to avoid a possible death sentence. As we noted in *Ramseur*, in 1972 "this Court invalidated the death penalty precisely because it allowed (and thereby tended to compel) defendants to forgo a trial on guilt and plead *non vult* in order to avoid death." 106 *N.J.* at 195.

D. *Propriety of Custodial Sentence*
 Because he found that it merged with defendant's capital murder conviction, the trial court dismissed the felony

murder conviction at the sentencing hearing. On the remaining counts, the court imposed a custodial sentence of 224 years with 87½ years of parole ineligibility. Defendant does not challenge the validity of those convictions but claims only that the sentence is excessive and manifestly illegal. We disagree.

In sentencing defendant, the trial court identified and weighed the aggravating and mitigating factors as required by *N.J.S.A.* 2C:44–1a & b. The court found four aggravating factors: (1) the heinous, cruel, or depraved nature of the crimes; (2) the gravity and seriousness of harm inflicted; (3) the risk that defendant will commit another offense; and (4) the need to deter. The court found only one mitigating factor, namely, that defendant had no history of prior criminal activity. Based on its finding that the aggravating factors outweighed the mitigating, the court concluded that consecutive sentences and sentences with parole stipulations were warranted. The court recognized that it had "imposed a substantial sentence calling for consecutive sentences and periods of parole eligibility because the Court finds that they are warranted by the horror of the case and the damage done to the victims who suffered over substantial periods of time."

Defendant suggests that in the event we were to reverse her murder conviction, she would have to be resentenced in accordance with the guidelines contained in *State v. Yarbough*, 100 *N.J.* 627, 643–44 (1985), particularly those guidelines governing the overall outer limit on the cumulation of consecutive sentences. Although we reverse defendant's murder conviction, we refuse to order adjustment of her custodial sentences on remand, so as to have them comply with *Yarbough*'s consecutive sentencing guideline. As we recognized in *Yarbough*, "even within the general parameters that we have announced there are cases *so extreme and so extraordinary* that deviation from the guidelines may be called for." 100 *N.J.* at 647 (emphasis added). No one can doubt that defendant's brutal pattern of conduct involving the various victims fits the exception we envisioned in *Yarbough*. Nonetheless, we have serious

reservations about the length of the custodial term imposed and believe that a more realistic sentence would be one that ensured that Moore would be ineligible for parole for the remainder of her life. We thus defer to the trial court with respect to the custodial sentences it imposed and leave to its discretion any reconsideration following disposition of the murder count.

Accordingly, we reverse the judgment entered on the murder conviction and imposition of the death sentence, and remand the matter for further proceedings consistent with this opinion.

HANDLER, Justice, concurring.

This is a shocking capital-murder case. The Court, in a comprehensive, thorough and soundly reasoned opinion, reverses the defendant's murder conviction and death sentence. I concur.

The majority concludes that defendant is not death eligible because the evidence is insufficient to enable a jury to determine beyond a reasonable doubt that the death of the victim was the result of any homicidal act of the defendant committed "by her own conduct" as required under *N.J.S.A.* 2C:11–3c. *See ante* at 301–03. The Court reiterates the interpretation of this statutory requirement adopted in our recent decision of *State v. Gerald*, 113 *N.J.* 40, 93–100 (1988), where we ruled that in order to satisfy the "own conduct" requirement of *N.J.S.A.* 2C:11–3c, the State had to prove beyond a reasonable doubt that defendant's conduct was the direct and immediate cause of death. *Ante* at 299.

In this case, the Court has examined the record to determine whether the evidence "is sufficient to establish that Moore *actively and directly participated* in the homicidal act, *i.e.*, in the infliction of the injuries that caused the victim's death." *Ante* at 301–02. The Court concludes, as noted, that the evidence is insufficient to meet this requirement. I agree, although I do not subscribe to the Court's characterization of this requirement as " 'merely a triggering device for the death

penalty phase at the trial,' " *ante* at 300 (quoting *State v. Gerald, supra,* 113 *N.J.* at 99). Rather, I believe this requirement is most appropriately regarded as an "element" of the crime of capital murder that serves both to define capital murder and to differentiate it from a murder conviction thus narrowing the class of murders that are death-eligible. The element of murder entailing the actor's "own conduct" is one that separates murder from capital murder. It must be established by the State by proof beyond a reasonable doubt and should be determined by the jury in the guilt phase of the trial. *See State v. Gerald, supra,* 113 *N.J.* at 146-47. (Handler, J., concurring in part and dissenting in part). I am satisfied that for this reason, the defendant's capital murder conviction must be reversed.

I also concur in the reasons advanced by the Court for reversing the defendant's murder conviction. In particular, I agree with the Court's assessment of trial error with respect to the failure to properly and clearly instruct the jury on "diminished capacity" as an affirmative defense negating the culpable state of mind necessary to charge purposeful or knowing murder. As noted by the Court, the trial court here limited the evidence of defendant's mental disease or defect solely to the defense of insanity. *Ante* at 283-88.

The Court also correctly rules that the evidence was sufficient to require the charge of aggravated manslaughter and manslaughter, *N.J.S.A.* 2C:11-4a, b, and that the trial court erred in failing to give such an instruction. *Ante* at 288-89. The Court recognizes the relevance of diminished capacity evidence to the manslaughter offense. It states that "the trial court should have instructed the jury that if they did not find knowing or purposeful conduct, they should then appraise the evidence to determine whether defendant was guilty of manslaughter." *Id.* at 289. I would add that while the evidence of diminished capacity itself might not justify an instruction to the jury that it could, if believed, reduce murder to aggravated or ordinary manslaughter, it was nonetheless relevant evidence

as bearing on the manslaughter charge. It should thus have been the subject of an instruction to the jury that would clarify the difference between its consideration of diminished capacity as an *affirmative defense* to murder and its consideration as generally probative evidence relating to the manslaughter charge. See *State v. Zola,* 112 *N.J.* 384, 443 (1988) (Handler, J., concurring in part, and dissenting in part).

The Court determines correctly that there was reversible error in the penalty phase of the trial. The major irremediable error, conceded by the State, relates to the improper instruction on the weighing of aggravating and mitigating factors. *Ante* at 303. I express, however, serious reservations concerning the Court's conclusion that the substitution of an alternate juror on the penalty phase was not cognizable as error, or in any event, was not plain error warranting a reversal. *Ante* at 305–07. In my opinion, we should not weigh or distinguish the gravity of an error in terms of whether the error is initially noted on appeal as plain error or initially noted by defense counsel at the trial level. *State v. Bey I,* 112 *N.J.* 45, 118 (1988) (Handler, J., concurring). Such a distinction would distract and encumber the Court in exercising its constitutional and statutory responsibility in determining capital causes on direct appeal pursuant to an enhanced standard of review.

I hesitate, however, to stigmatize the substitution of the alternate juror in this case as reversible error. I am cognizant of the 1985 amendment of the death penalty statute, *N.J.S.A.* 2C:11–3c(1), cited by the Court, *ante* at 306, which authorizes such substitution. Nevertheless, I think it is unrealistic, and potentially unfair and prejudicial, to consider the penalty phase of the trial as truly bifurcated and separate from the guilt phase. There surely is no such division; rather, the entire capital murder prosecution is a continuum, with the evidence adduced at the guilt phase routinely admitted at the penalty phase. The substitution of a new juror raises the spectre of

"mixed" deliberations that may not capture the essence of the kind of jury deliberations that result in unanimous verdicts. *See State v. Trent*, 79 *N.J.* 251, 256 (1979); *State v. Corsaro*, 107 *N.J.* 339 (1987). If, therefore, such substitution occurs in the penalty phase, the Court should carefully instruct both the substitute juror and the original jurors concerning the need to reconsider and reassess the evidence bearing on guilt, accepting the fact that defendant has been found guilty of intentional murder. *See State v. Ingenito*, 87 *N.J.* 204 (1981). Consequently, the substitution in this case poses a genuine concern that should be carefully addressed.

Finally, I am constrained to state that I continue to adhere to my belief, expressed in *State v. Bey II*, 112 *N.J.* 123, 188–90 (1988) (Handler, J., dissenting); *State v. Koedatich*, 112 *N.J.* 225, 383 (1988) (Handler, J., dissenting); *State v. Ramseur*, 106 *N.J.* 123, 343 (1987) (Handler, J., dissenting), that the death penalty statute as enacted and applied in New Jersey violates constitutional and fundamental fairness standards. Therefore, I would also vote to reverse the death penalty on these grounds.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Concurring in result*—Justice HANDLER—1.